UNITED STATES, Appellee

v

JIMMIE L. HENDERSON, Disbursing Clerk Seaman, U. S. Navy, Appellant

11 USCMA 556, 29 CMR 372

557

558

No. 12,634

Decided July 1, 1960

*Commander David Bolton* argued the cause for Appellant, Accused.

*Commander Louis L. Milano* argued the cause for Appellee, United States.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

Accused was tried by general court-martial for premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918, and two counts of intentionally inflicting grievous bodily harm, contrary to Article 128 of the Code, 10 USC § 928. He pleaded not guilty, but was convicted as charged and was sentenced to be put to death. The convening authority approved, and thereafter a board of review in the office of The Judge Advocate General of the Navy affirmed the findings and sentence. The case is before us on mandatory review pursuant to Article 67(b)(1), Uniform Code of Military Justice, 10 USC § 867, and upon accused's petition for new trial under Article 73 of the Code, 10 USC § 873.

### II

Although the facts of this tragedy are not in dispute, it may be helpful for orientation purposes to outline them. Such other operative facts as are necessary will be mentioned as they become pertinent during our discussion of the respective issues.

Accused, testifying under oath as a witness in his own behalf, acknowledged committing the acts charged. He related the incidents of the day in question and the events that led up to the crimes in great detail, and his version is in substantial accord with the testimony presented by the Government and his pretrial confession. The evidence shows that the day prior to the commission of these offenses, accused had been convicted by a special court-martial for larceny of a wrist watch from a shower room of the U.S.S. UVALDE, on which he served. The accuser on that offense was an Ensign Morris, who was accused's division officer and under whom accused worked as disbursing clerk for the ship. Defense counsel for accused at that trial, and upon whose advice the latter pleaded guilty to the theft, was an Ensign Harrison, who was Morris' roommate on the ship. While sentence had been adjudged by the special court, the convening authority had not yet acted on the case and accused was not in confinement. The next morning, accused arose at an extremely early hour and sought out one Verbeek, the security watch. He intended to take Verbeek's .45 caliber pistol from him, planning to use it to kill Ensign Morris, against whom he had previously been heard to express resentment on different occasions. For that purpose he had armed himself with a pair of scissors. He did not use them, however. Instead, he chatted, drank coffee, and listened to records with Verbeek in the ship's carpenter shop for well over two hours. At approximately 6:00 a.m., as Verbeek was about to make his inspection tour, accused attacked him from behind with a hammer he had obtained from the shop, beating him severely about the head and breaking a hand Verbeek raised in an effort to protect himself. Having felled the security watch, accused took his pistol and ammunition and proceeded to the stateroom of the ship's Executive Officer. He was frustrated, however, in his intention to kill that officer—whom he considered unfair and "two faced"—for he was not aboard the ship. Accused was apparently not to be denied exacting retribution from those he considered responsible for his problems, though, for he went next to the stateroom occupied by Morris and Harrison. The latter awakened to find the light on and accused in the room. He got down from his bunk and suggested that accused leave and return later at a more appropriate hour. Meanwhile Morris had awakened and sat up. Accused had the pistol he had taken from Verbeek in his hand. Both officers pleaded with accused and attempted to convince him to put down the gun, but without success. He shot them, killing Ensign Morris and seriously wounding Ensign

560

Harrison. After the shootings, accused made his way to the flying bridge of the ship. There and in the pilot house he stayed for some six hours, during which period he remained armed and held another enlisted man with him as hostage for about two hours. He was finally prevailed upon to give up his weapon and surrender only after a chaplain had spent approximately four and one-half hours with him.

Accused having confessed judicially to the foregoing facts, it is hardly surprising that the principal matter in dispute at trial concerned his mental responsibility and his capacity to premeditate or entertain specific intent. Testifying for the defense on that issue was a civilian psychiatrist. He stated his expert opinion that accused suffered from a chronic paranoid condition; was "mentally ill, having a very sick and disordered mind"; was absolutely incapable of "entertaining the necessary premeditation, intent, malice, design or contrivance"; and that accused's actions both in planning and executing these offenses were directly the consequence of his mental illness and paranoid condition. Notwithstanding this mental condition, however, the defense psychiatrist reluctantly agreed that accused met the legal tests for responsibility, in that he could distinguish right from wrong and, although his ability to do so was badly impaired, could adhere to the right. He further stated he did not agree that the legal test was a proper one for determining criminal responsibility, and, in addition, that he was not satisfied with the diagnosis he had been able to make; that he felt "this man is insane in every sense of the word; legally, medically and in the ordinary layman sense of being crazy"; and that passage of time would confirm his belief and prove the legal formulae were inappropriate for measuring accused's mental responsibility.

The prosecution, to satisfy its burden of proving accused's sanity, presented the rebuttal testimony of four Navy psychiatrists, a Navy psychologist, and a civilian psychiatrist. Stated generally, it was their conclusion that accused suffered from a paranoid personality — a character disorder — but was mentally competent, able to distinguish right from wrong and adhere to the right, and capable of premeditating, except that one doctor believed accused's ability to adhere to the right was partially impaired.

### III

We turn our attention first to the petition for new trial. The primary contention in support of this requested relief is that new evidence relevant to accused's mental condition at the time of the offenses has been discovered since his conviction. In this connection we have been furnished with the statements of psychiatrists who, upon examination of accused and/or review of the record, believed him competent to assist in his own defense, but concluded he was not legally responsible for his crimes. To the contrary, other post-trial psychiatric examiners who observed accused have corroborated the conclusions reached by the witnesses who testified for the Government at trial. Thus, this is not a case where because of additional information post-trial experts uniformly agree upon a different conclusion than that reached by the medical witnesses who testified at trial or the triers of fact who resolved the disputed issues. Nor, obviously, is this a case where the court members were not aware that the issue of sanity existed because it was not raised before them. To the contrary, all facets of accused's mental state, both at the time of the offenses and the time of trial, were thoroughly and carefully explored. Indeed, as we previously mentioned, that was the only defense raised at trial, and we point out that approximately five days were consumed in introducing evidence to support the respective theories. It is therefore appropriate to quote from previous opinions where we have dealt with the problem of post-trial evidence bearing on sanity:

". . . If the issue has been fully litigated at the trial level, there is no requirement . . . [to] upset the holding or launch into an independent investigation." [United

States v Burns, 2 USCMA 400, 406, 9 CMR 30.]

To the same effect is our language in United States v Schick, 6 USCMA 493, 20 CMR 209. There we stated:

"Once an accused has had a fair opportunity at the trial level to litigate the issue of his mental responsibility for an offense and his capacity to stand trial, those issues should, on appeal, be accorded the same treatment as all other contested matters. We mean that the question should not be tried *de novo* at every appellate level. A day in court means one fair and just trial of contested issues, and, when that has been granted to an accused, he does not have a right to a second trial in an appellate forum."

While we remanded the *Schick* case to the board of review for reconsideration of the question of sanity, such action was occasioned only because of the most unusual circumstances of that case, and we expressly stated:

". . . In taking this action we are not holding out to accused persons the hope that this Court will require boards of review to become trial forums."

No such extraordinary situation exists in the case at bar. Here the defense expert was not handicapped in presenting his conclusions to the court-martial, nor in the development of his diagnosis. Neither has any evidence been uncovered that was not available to the defense at the time of trial. Further, the conclusions of the experts now tendered by the defense are completely at odds with the opinions of other respectable and authoritative specialists who examined and diagnosed the medical condition of accused during the pendency of this appeal.

Moreover, it is worth mentioning that the post-trial psychiatric evaluations upon which the defense places reliance are based in greater or lesser degrees on the testimony in the trial transcript and other record material, and some have been made without the benefit of personal examination of the patient. As we observed in United

562

States v Tavares, 10 USCMA 282, 284, 27 CMR 356, subsequent opinion predicated on the same evidence as prior conclusions is not such evidence as warrants a new trial.

Without doubt we are called upon in this instance to make a decision of utmost gravity, as is forcefully attested by the shocking nature of the crimes and the penalty to which accused stands sentenced. Under such circumstances it is a most difficult determination, particularly when the question is the mental responsibility of the accused—a matter we have often accorded preferred status. Those factors, however, cannot be allowed to thwart the conclusion required by the posture of this record. When the petition together with the record of trial are considered by their four corners, it is plain that the argument pressed upon us merely raises anew an issue into which thorough inquiry was made in the trial forum. Accused has litigated and lost, and quite obviously it would be to his distinct advantage to gain a second bite at the apple. However, from the facts set forth above, it is clear beyond peradventure that he has not brought himself within the sweep of either arm of Article 73 of the Code, supra. He is not, therefore, entitled to a new trial and, accordingly, his petition for the same is denied.

IV

Appellate defense counsel has also filed extensive pleadings and numerous assignments in support of accused's mandatory appeal. While we have given them careful consideration, no good purpose would be served by extended discussion of those without merit. Accordingly, we will deal with only a few of the more important issues.

Among other things, complaint is made that the convening authority and his responsible staff officers permitted the accused to be questioned at a press conference held on the afternoon of the day accused committed these offenses, only a short time after he surrendered. We will not dwell on this subject at length. Suffice it to note

that it should hardly be surprising that these tragic shipboard incidents occasioned more than passing interest on the part of news and press representatives. They were gathered at dockside, and it is quite natural they would desire to interview the accused. The latter expressed the same wish, and it was at his insistence that the interview was permitted. Previous thereto, he was warned of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. He was also examined by psychiatrists and a psychologist to determine whether he was capable of holding the conference. Further, he was counseled on the seriousness of the charges and advised that the conference would not advance his interests, that information or statements elicited could be used against him, and that he would be wise to remain silent. Finally, and in the presence of the press, he was once more advised of his rights. Like the board of review, we can think of little more responsible authorities could do to dissuade accused from appearing before the press conference unless they were to hold him incommunicado, in which case his complaint would no doubt be of an entirely different nature. Moreover, we point out that, although there is no verbatim transcript of the conference, the context of accused's statements thereat was essentially the same as his testimony at trial, and they could hardly have been more damaging. Accordingly, we find no merit in this matter.

## V

Another item assigned by the defense is that accused was shackled with handcuffs during the first five days of trial. It is submitted by appellate defense counsel that the record is devoid of any indication that at any time during trial accused's conduct justified this form of restraint and that the sight of such continued shackling undoubtedly had a tremendous impact on the court members. Thus, it is argued that the curb constitutes material prejudice and denial of due process of law.

While we believe the instances justifying shackling of accused persons in the courtroom are rare, we are sure the law officer was well within his discretion in allowing that form of repression in this case. See United States v Buxton, 16 CMR 732, 745; and Colonel Winthrop's treatise on Military Law and Precedents, 2d ed, 1920 Reprint, at page 164. The record of trial shows that the question was discussed with the officer responsible for accused's security before trial commenced. It was upon his recommendation that the law officer acted, and the evidence of accused's violent and unpredictable behavior in pretrial confinement fully justifies the determination made. It begs the question to argue that accused did not misbehave in court; rather, the issue is whether there were reasonable grounds to believe the restraint necessary. It is not necessary to allow violence before taking preventive measures. Moreover, it is to be noted that the defense never posed an objection at trial to the procedure; that the law officer ordered the handcuffs removed after the first five days of this long trial; and the court members were specifically instructed that they were to disregard the fact that they had observed the accused while in manacles. We are unable to perceive either error or prejudice to the accused arising from this situation and, therefore, reject this assignment.

## VI

The chaplain who was instrumental in convincing accused to surrender testified as a witness for the prosecution. However, he consistently refused—just as he had prior to trial—to disclose one small portion of his lengthy conversation with the accused on the flying bridge. He was apprised that there was no legal privilege to remain silent; that even if there was one it had been waived by the accused, who was on trial for his life and specifically requested that the chaplain make full disclosure; and, further, the law officer directed that he should answer. Nevertheless, inasmuch as that part of his conversation with accused had been out of earshot of anyone else and apparently because of a theory that an an-

swer would discredit the traditionally confidential nature of relations between chaplains and enlisted men, the chaplain refused to answer the following question posed by trial defense counsel:

"Now, did he say anything to you about what he had wished he had done in the stateroom of Mr. Morris and Mr. Harrison?"

Later, after the case for accused had been presented, the chaplain voluntarily returned as a witness. It would appear either that the basis of his prior refusal had been misunderstood or that he had overcome his scruples, but in any event he revealed that portion of the conversation he had previously withheld, which was the single following statement by accused:

". . . What I really should have done is stuck the gun—the barrel of the gun in Mr. Morris' mouth. Then I know I would have killed him."

Appellate defense counsel argues that this disclosure demands reversal, but we are impelled to disagree. First, it is to be noted that in accused's testimony from the witness stand concerning his discussions with the chaplain, he admitted:

"I said I wished I would have stuck the gun into his mouth to make sure he was dead."

Furthermore, it appears that the chaplain had offered to disclose the accused's statement in private but, in any event, in view of accused's testimony, there can be no question but that the defense was well aware accused had made such statement. The defense originally sought to get the statement into the record, and it must be noted that this statement really added nothing to the tragedy for, from the balance of the chaplain's testimony, it was quite clear that accused freely admitted the crimes, expressed no remorse whatever for his acts but, to the contrary, felt justified because of his belief that Ensign Morris "needed killing." Other statements before his surrender indicated he was not sure whether his attempt had been success-

ful and this, at the time, was of principal concern to him. Thus, the answer at first withheld by the chaplain loses significance.

In light of the above facts, we agree with the board of review that the suppression of this isolated bit of information at the investigation and during the early stages of the trial did not impede preparation of his defense or otherwise operate to his prejudice.

Before leaving this facet of the case, we might also dwell on another related assignment. When the chaplain returned to the witness stand and offered to disclose the statement by accused, he was still reluctant to do so before the press and spectators present in the court room. Accordingly, the law officer cleared the court during this brief portion of the testimony. It is contended that this procedure denied accused his right to a public trial.

We do not agree. First, this is not a case where the proceedings were conducted in secret in their entirety. To the contrary, the court was only closed during one brief part of the testimony of a single witness—testimony which did not disclose anything substantially different from what had already been brought out. Also, it can be argued that the circumstances in their totality constituted good reason for the law officer's action within the purview of paragraph 53e, Manual for Courts-Martial, United States, 1951. See United States v Brown, 7 USCMA 251, 22 CMR 41. Regardless of those factors, however, and more important, we note that at the beginning of the trial the accused had requested that spectators and all but a small segment of the press be excluded from the trial. Also, it must be remembered the trial defense counsel tried assiduously to elicit this testimony, and when the law officer indicated his disposition to accommodate the chaplain in his request, defense counsel failed to register any protest to the procedure and in fact tacitly consented, and this in the face of the fact that our decision in United States v Brown, supra, had been injected into the discussion and brought

to the attention of the law officer and counsel. Accordingly, this contention must be resolved against accused.

## VII

On a day toward the end of the trial, it was developed that prior to the convening of court that particular morning the president of the court-martial confronted the law officer in the corridor with regard to two questions he desired to ask. The law officer explained to him that the questions should be posed in a nonpartisan fashion and toward this end invited the president's attention to a copy of the decision by this Court in United States v Blankenship, 7 USCMA 328, 22 CMR 118. The president "skimmed through" the opinion hurriedly to be sure he posed his questions properly. Pointing out that *Blankenship* was a murder conviction involving the issue of capacity to premeditate, appellate defense counsel argues that substantial doubt is cast on the fairness of accused's trial.

As the board of review stated in discussing this issue, this action by the law officer was ill-considered and improper, and gives rise to a presumption of prejudice. However, that presumption is rebuttable. As we said in United States v Lowry, 4 USCMA 448, 453, 16 CMR 22:

". . . On the other hand, if the accused was unaware of the reference, the submission of the cases would be tantamount to a private communication between the law officer and the court. A communication of that nature is presumed to be prejudicial. United States v Adamiak, 4 USCMA 412, 15 CMR 412. The presumption may be overcome by a 'clear and positive showing' that the improper communication did not, in any way, influence the decision."

Here trial defense counsel was well aware of what transpired, and the president and law officer related the details of their discussion. Further, perusal of the *Blankenship* opinion shows that it could not affect the ultimate issue of accused's guilt or innocence,

for the matter we there discussed concerned only questioning by court members and their responsibility to remain nonpartisan. Accordingly, we are satisfied that the presumption is rebutted, and we must rule against accused on this issue.

An analogous problem is also presented by questions propounded by members of the court. Inquiry by trial defense counsel developed that the law officer did not disclose the contents of certain written questions submitted to him by court members. On appeal, it is now contended that the law officer's action in rejecting certain questions without divulging their contents to counsel constitutes an unlawful private communication between the law officer and the court. It is further contended that the procedure used was presumptively prejudicial, and that the presumption is not dispelled.

We point out that it is entirely proper for the court members to have submitted questions in writing. United States v Martin, 8 USCMA 346, 24 CMR 156; United States v Blankenship, supra. Further, as the Government contends, trial defense counsel observed the steps being taken, but neither registered objection nor requested to see those questions which were rejected. Moreover, later in the trial, when defense counsel did inquire into the matter, it was developed that the law officer had only ruled out two of the questions which were submitted. The nature of those questions was made known, and it was also brought out that both were later answered. Under the above circumstances, we conclude that any possibility of prejudice to the accused by reason of the procedure employed by the law officer is effectively overcome.

Another related matter concerns an out-of-court conference held by the president of the court-martial concerning the manner in which security guards performed their duty. Present at the meeting besides the senior court member were officials in charge of confinement facilities and personnel, the law officer and trial counsel, and it is

contended that at this extrajudicial conference the president became aware of other misconduct by accused.

We point out that when inquiry was made into the matter, the full circumstances of this discussion were spread on the record and the only item conceivably detrimental to accused was the mention of relatively minor misconduct on his part. Cast against the background of the nature of these charges—and accused admits the killing and assaults—the risk of prejudice is remote. Any shadow of doubt is dissolved, however, when consideration is given to the case presented in behalf of accused. As previously noted, the only issue was sanity, and apparently in an endeavor to bolster their case in that regard, the defense itself introduced evidence of a despicable and almost unbelievable course of wanton misconduct—the details of which are perhaps better left unmentioned—by accused while in pretrial confinement. Again we must conclude the risk of harm to accused is dispelled by the record.

Moreover, before turning to another issue, we might add parenthetically in relation to the above three related matters that, while our determination of no prejudice is independent, our judgment seems to be corroborated by the action of trial defense counsel. After probing into these items at length, he appeared to be satisfied for he made no objections, challenges, or motions for relief. It would seem that his estimate of the situation was the same as that we make.

## VIII

Another item meriting attention is the fact that one court member was shown to have consulted an outside source, namely, a dictionary, for definitions of the following four psychiatric terms: Psychosis, psychoneurosis, paranoid, and schizophrenia. In United States v Webb, 8 USCMA 70, 23 CMR 294, we reversed a conviction for crimes which sounded in trafficking and use of habit-forming drugs because a court member was shown to

have consulted a book on narcotics. The defense urges that a similar result is required here.

For the purpose of this case, we will employ the rule that the member's action is presumed to have been prejudicial to accused. However, as we expressly stated in United States v Wolfe, 8 USCMA 247, 24 CMR 57, this presumption can be completely dispelled by proof that the impropriety did not harm accused. Here, unlike the *Webb* case, we are not left to grope in the dark concerning the use made of the book. Rather, defense counsel's questioning of the member established that he had used it only to refresh his recollection as to the meaning of certain psychiatric terms used by the expert for the defense. The member stated unequivocally that the definitions neither differed from his previous understanding of those terms nor from the meaning given them by the psychiatric experts who testified. Further, he testified that he was in no wise influenced in his decision on the controverted facts by his consultation of the dictionary. Last, as the board of review pointed out in its discussion of this matter, there was no issue raised at trial over the meaning of the terms here involved. We believe the above recited facts show beyond any question that the member was only seeking to understand the definition of medical terms as used and defined by the expert witnesses and that the possibility of prejudice from his use of the dictionary is wholly refuted. Accordingly, this assignment of error is overruled.

## IX

Shortly before the court-martial commenced its deliberations on sentence and at the same time he inquired about the member's use of the dictionary, trial defense counsel questioned the entire panel with regard to use of outside material. Appellate defense counsel urges that the law officer's refusal to allow inquiry as to whether the court had referred to the Manual for Courts-Martial, United States, 1951, was prejudicial error.

The record shows that after the member who had consulted the dictionary related his use thereof, defense counsel queried him as follows:

". . . [O]ther than this dictionary . . . did you avail yourself of any other treatises or works or pamphlets?"

The member responded in the negative, and it was thereafter that defense counsel asked him whether he had utilized other books such as the Manual. At this point, trial counsel took issue with the propriety of the question about the Manual and, after the parties had argued their positions, the law officer sustained the objection.

We point out that this case was tried before our decision in United States v Rinehart, 8 USCMA 402, 24 CMR 212, and accordingly it would seem that the law officer founded his ruling on the basis that it was not improper to refer to the Manual except in closed deliberations. That he would be mistaken in such a conclusion is apparent from the decision in *Rinehart,* supra. However, that need cause no concern in this case. The one court member indicated, upon defense counsel's initial inquiry, that he had referred to a dictionary, but answered his second question, quoted above, in the negative. We agree with the board of review that implicit in those responses is an answer to the question the law officer precluded. And as to the other court members, each answered categorically that he had consulted no outside materials. Thus, the curtailment on questioning by the law officer was of no consequence. Likewise, as we noted earlier, this case was tried before the effective date of *Rinehart.* Thus, even assuming —contrary to our conclusion above— that the Manual had been consulted, there is no reason to disturb the findings or sentence in the absence of specific prejudice. United States v Vara, 8 USCMA 651, 25 CMR 155. As the board pointed out, none appears. Hence we reject this contention.

## X

Included in the law officer's instructions to the court-martial is the following charge:

"The accused initially is presumed to have been sane at the time of the alleged offense. This presumption, as a matter of law, authorizes each member of the court to assume that the accused is sane until such time, or until from the evidence a reasonable doubt of his sanity at the time in question appears in the mind of such member. When evidence tending to prove that the accused was insane at the time of the alleged offense is introduced, the sanity of the accused becomes an issue of fact. In determining this issue of fact, you are entitled to consider the evidence introduced at the trial pertaining to the sanity of the accused in the light of your own common sense, your general knowledge of human nature and the ordinary affairs of man. Thus, you may consider that the general experience of mankind is that most people are sane and that insanity may be feigned. This general experience may be taken into account in weighing the evidence pertaining to the issue of the accused's sanity. The burden of proving the sanity of the accused beyond a reasonable doubt, like any other facts necessary to establish the offense alleged, is on the prosecution. If in the light of all the evidence, taking into consideration your general knowledge of human affairs and the ordinary affairs of life, you have a reasonable doubt as to the mental responsibility of the accused at the time of the alleged offense, you must find the accused not guilty of the offense."

Appellate defense counsel assails this instruction, arguing that it improperly operated to place upon the accused the burden of establishing a reasonable doubt as to his sanity.

This instruction is very similar to the one recently before us in United States v Oakley, 11 USCMA 187, 29 CMR 3. As in that case, when the instruction is taken in its entirety, and considered in light of the other instructions on the burden of proof and rea-

567

sonable doubt, there can be no question but that the court-martial understood it must acquit accused if they had a reasonable doubt as to accused's sanity at the time of the offenses. Accordingly, the assignment must be resolved adversely to accused. United States v Oakley, supra; United States v Biesak, 3 USCMA 714, 14 CMR 132.

## XI

Immediately after the last quoted instruction, the law officer charged the court-martial, with regard to the capacity to premeditate:

"Now, in connection with determining the factual issue of whether the accused had a premeditated design to kill, as alleged in Charge I and the specification thereunder, you should consider any evidence tending to show that the accused was suffering from a character or behavior disorder which, although not amounting to evidence of a lack of mental responsibility, may have affected his capacity to premeditate. If in the light of all the evidence, including that concerning the character or behavior disorder, you have a reasonable doubt that the accused, at the time of the alleged offense, entertained the premeditated design to kill involved in the offense of premeditated murder, you must find the accused not guilty of premeditated murder.

"Just as a man is initially presumed to be sane at the time of the offense, he is initially presumed to be capable of premeditation, and each member of the court is, therefore, authorized to assume that the accused was capable of premeditation until from the evidence a reasonable doubt as to his ability to premeditate at the time in question appears in the mind of such member."

This instruction is challenged by appellate defense counsel on the same basis as the preceding instruction on sanity. The short answer to this assignment is that the instruction is consonant with our holdings, for just as a man is presumed to be sane, so is he presumed

**568**

to be capable of premeditation. United States v Dunnahoe, 6 USCMA 745, 21 CMR 67. Thus, and for the same reasons set forth in the previous assignment, we hold this instruction does not shift the burden of proof. Accordingly, this assignment must be rejected as without merit.

## XII

Additionally, counsel for the defense invites us to reverse this case on the ground of cumulative error. United States v Yerger, 1 USCMA 288, 3 CMR 22. As has been mentioned several times, this is a capital case, and the trial was somewhat prolonged, lasting approximately three weeks. The record is voluminous, running into thousands of pages of testimony and exhibits, and the arguments and briefs on appeal are well-nigh exhaustive. Those factors, however, are not the touchstone. Thorough consideration of the record dictates that none of the assignments—either individually or collectively—operated to the material prejudice of the substantial rights of the accused. There is, therefore, no merit in this contention, and we are constrained to reject appellate defense counsel's invitation.

## XIII

One final matter bears mentioning. In the recent case of United States v Russo, 11 USCMA 352, 29 CMR 168, a majority of this Court held that intermediate authorities possess the power to commute a death sentence. That case was decided after the ruling by the board of review in the instant proceeding. We note that in this appeal the board was expressly urged to reduce accused's sentence from death to some lesser punishment, or, in the alternative, to make such a recommendation to the Secretary of the Navy. Citing United States v Freeman, 4 USCMA 76, 15 CMR 76, the board of review concluded it was without "power to change the punishment adjudged if it approves the finding of guilty of premeditated murder." We need not, however, be concerned that the board of review—operating under the view we had pre-

viously announced—misconceived its power, for the board members indicated in forceful language their conclusion that the sentence as adjudged was entirely appropriate in light of the circumstances of the case, and they expressly refused to recommend diminution of the sentence. Moreover, there is no suggestion that the convening authority desired to extend any clemency to this accused. It is crystal clear, therefore, that the actions at intervening levels would have been no different even had those reviewers been aware of this Court's view as announced in *Russo, supra.* Hence there is no need to remand the case for reconsideration of this matter.

## XIV

We have examined the entire record and have given consideration to other arguments advanced by appellate defense counsel and the views presented in the dissenting opinion, but find no prejudicial error. While we believe little purpose would be served by arguing them at length at this level, because this is a capital case and, in the interests of completeness, it may be well briefly to consider those causing most concern to our dissenting brother. With regard to the challenge for cause against Captain Clarke, we think it necessary that attention be given to the entire pertinent *voir dire* examination and the fact that this sort of challenge was directed to every member of the court. When the Captain's testimony is considered in its entirety, it is clear he was stating categorically that he would follow the law as enunciated by the law officer but felt constrained—and, we might inject parenthetically, properly so—to reserve factual determinations to himself. He thus distinguished between his role as a finder of fact and a follower of the law. This was apparently the construction placed on the language by the law officer, for the Captain had stated that his answer was predicated upon an assumption that the law officer would venture an opinion on some matter, and sensibly that could only involve facts, for instructions are commands, not opinions. Trial defense counsel must have placed the same interpretation upon the member's answers, for no peremptory challenge was exercised and we feel certain that, had defense counsel believed a member of the court would not follow the law, an unused peremptory challenge would not be reflected by this record.

Concerning the identification by another court member of the place where a bullet struck Ensign Harrison, we deem it important to note that the member merely assisted the law officer in identifying for the record the point of entry which the victim indicated in open court. No contention is made that the law officer became a prosecution witness by reason of his part in this matter, nor is it argued that had the law officer himself completed the description of the particular place on the victim's body, he would have become a witness. Hence, it is stretching the point to hold the court member did so merely by supplying the appropriate terminology for him. Regardless, however, it is to be borne in mind that the matter was an innocuous in-court aid to the participants, and neither the point of entry of the bullet nor the seriousness of the wound were contested at trial. Further, the member's answer was, of course, given in the presence of the defense, yet no objection was taken and no prejudice has ever been asserted. That necessarily is justifiable silence for, even if we were to assume *arguendo* the member had testified, we are unable to see wherein there was any possibility of harm to accused nor how he was standing to complain on appeal. See United States v Law, 10 USCMA 573, 28 CMR 139, and cases therein collated.

Adverting briefly to the assertion that the prosecution improperly adduced evidence of the deceased's good character, we think it worthwhile to direct attention to the context and the order in which the disputed testimony came into the record. The Government had previously introduced evidence of accused's unwarranted surly attitude and antagonism toward his deceased

**569**

victim, Ensign Morris. The testimony indicated this feeling might be due to the fact that Morris' predecessor, the accused' previous immediate superior, had been somewhat more lax than Morris in requiring performance of duties. It was against this background that the defense first asked on cross-examination concerning the "type of officer" Morris was, and it was then developed that he was fair and conscientious, was not prejudiced, and did not put upon accused unfairly. And it was not until some six days later that the witness Hart was called to the stand by the Government to relate his knowledge of the shootings. On direct examination he corroborated the evidence of Henderson's poor attitude toward Morris and cumulatively added to the defense's portrayal of Morris as a good officer. The effect of this testimony was to show the killing was without justification. In short, we conclude the testimony was material and relevant for the purpose for which it was introduced. But, in addition, we point out that the defense first opened up the area by inquiring into what "type of officer" Morris was. And that, of course, is understandable in light of the fact that the only real issue was insanity, and the defense could bolster that claim by showing the accused's actions, being unprovoked, were those of an irrational man. Manifestly, the evidence was not improperly admitted nor prejudicial to accused's theory of defense.

Other contentions have been asserted, but we see no good purpose in mentioning them further at this level. The interested reader, however, will find many of them discussed by the board of review in its able opinion.

For the foregoing reasons, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

In my opinion, the conduct of this trial, resulting in the imposition of a death penalty, was so atrocious that the accused was denied due process. In no manner does it measure up to the standards laid down by Congress in the Uniform Code of Military Justice nor does it possess the high judicial character which we have sought to impress upon general courts-martial since 1951. Accordingly, I cannot concur in the judgment of my brothers that the proceedings are sufficiently regular to justify affirmance of the findings and sentence.

Tried by general court-martial for premeditated murder, in violation of Code, supra, Article 118, 10 USC § 918, and two specifications of aggravated assault, in violation of Code, supra, Article 128, 10 USC § 928, the accused was found guilty and sentenced to death. Intermediate appellate authorities affirmed, and the case is before us on mandatory review. Numerous assignments of error have been made by appellate defense counsel, and we have been deluged with voluminous briefs, motions, and petitions. Not all of the errors which I shall hereinafter discuss are formally before us. Nevertheless, I am sure that my brothers join me in the belief that, in capital cases, we must search the record in order to determine that nothing occurred which was prejudicial to accused's substantial rights. With that standard in mind, my examination of the proceedings convinces me that accused's rights were repeatedly invaded.

The factual picture set forth in the transcript is relatively simple. Accused was a twenty-year-old Negro sailor assigned to the U.S.S. UVALDE. He gained the rating of Disbursing Clerk Third Class and was the only enlisted man assigned to the UVALDE who performed duties concerning the pay of the ship's officers and crew. His immediate superior was a young officer, Ensign Arthur L. Morris, who reported for duty aboard the UVALDE sometime after Henderson had been assigned to the crew. Apparently, some friction developed between Ensign Morris and the accused over the manner in which the latter performed his duties. Henderson repeatedly told his shipmates that he would "get" Mr. Morris prior to his discharge. The accused eventually became involved in the theft of a wrist watch, and Ensign

**570**

Morris placed him on report. On May 27, 1957, a special court-martial was convened on board the UVALDE to try him. Henderson was represented by Ensign Harrison and entered a plea of guilty to larceny. He was sentenced to confinement at hard labor for four months and reduction to seaman. Enraged by the sentence, he announced his intention to kill Ensign Morris. During the early morning hours of May 28, 1957, Henderson assaulted the ship's security watch, one Verbeek, with a hammer and obtained from him a .45 caliber service pistol and two clips of ammunition. During the assault, Verbeek's hand was fractured and he suffered numerous severe head cuts. Henderson then proceeded to the Executive Officer's stateroom, intending also to shoot that officer. When he found the stateroom vacant, he entered a similar chamber shared by Ensigns Morris and Harrison. After an extremely brief discussion of his sentence, Henderson shot both officers. Morris died instantly from a penetrating wound of the heart, while Harrison was seriously wounded. Henderson then reloaded his weapon and left the stateroom. He subsequently seized a hostage and proceeded to the ship's bridge where he held a considerable force at bay for several hours. He finally was persuaded to surrender.

Dr. Bernard L. Diamond appeared as an expert medical witness for the defense. He testified that he had been a psychiatrist since 1939, having graduated from the University of California Medical School and completed a residency in the Neuropsychiatric Clinic of the University of Michigan. Following five years of military service as a psychiatrist, he engaged in private practice in San Francisco. He was certified in 1946 as a diplomate of the American Board of Psychiatrists and Neurology.

Dr. Diamond examined the accused on September 18, 1957. He reviewed his complete medical records and the reports of other psychiatrists and psychologists who had studied Henderson. He was advised of the family's history of mental illness. He had also read certain bizarre letters originated by accused while in confinement. He believed Henderson "to be mentally ill, having a very sick and disordered mind," his delusions being principally of a racial nature. He was incapable of premeditating Morris' murder or of entertaining the specific intent required in the charges. Initially, he expressed the view that he was not "unequivocally certain" that Henderson was unable to distinguish right from wrong and "reluctantly" agreed that he was able to adhere to the right. These impressions appeared to be based upon a belief that his testimony must accord with the strict requirements of the "tech manual." He subsequently described Henderson's behavior as "almost like a leaf in the wind, the wind being the turmoil of his mental abnormalities." When specifically asked on cross-examination whether the accused could adhere to the right, he ultimately declared that:

"His ability to adhere to the right is extremely badly impaired; it is somewhat questionable whether he can adhere to the right at all under any circumstances."

Dr. Diamond summed up his impression of Henderson in the following manner:

". . . I believe in my own heart with all my intuition and experience as a psychiatrist, having seen a number of these cases years afterwards, of having had—after they have arrived in prison and getting the full story and everything from the beginning and evaluating their case with my knowledge as derived from other cases—I feel that this man is insane in every sense of the word; legally, medically and in the ordinary layman sense of being crazy."

Navy psychiatrists testified that Henderson suffered from no more than a character disorder; that he knew right from wrong; was able to adhere to the right; and possessed the capacity to premeditate and entertain the required specific intent. Post-trial mental examinations, depending upon the psychiatrist involved, tend to support both the defense and prosecution experts.

At the outset, I must note the accuracy of Judge Latimer's observation that the accused judicially admitted the foregoing facts. Aside from that confession, the evidence overwhelmingly established the occurrence of these events. There is a sharp distinction, however, between proof of these facts and proof of Henderson's *guilt* of the crimes charged, for the evidence also raises an issue concerning both his mental responsibility for the offenses and his capacity to premeditate or to entertain a specific intent. It is in this light that the trial proceedings must be viewed. Accordingly, I turn to a chronological discussion of the various errors which infest the trial.

## I

At the commencement of the trial, counsel for the accused conducted an extensive *voir dire* examination of the court members. He specifically made inquiry concerning whether they were willing to heed the law officer's instructions on the law. Eventually all, except one, replied that he would abide by the law officer's advice. The remaining member, Captain Clarke, stated that he would follow the law officer's instructions if the latter "quoted" the law. Otherwise, he would permit his conscience to guide him. A final inquiry by the law officer and Captain Clarke's answer thereto provide a summary of his position:

"Q. Captain Clarke, I'm sure by this time you are familiar with the question. If you are chosen to sit upon the court, could you and would you abide by the instructions which I give you with respect to the law, or would you on the other hand let your own conscience be your guide as to what the law is or ought to be?

"A. I think, as I previously stated, I will abide by the law officer's instructions with regard to the law, *and if the law officer made an interpretation or an opinion, then my opinion would be weighed against his.*" [Emphasis supplied.]

Elsewhere in the record, Captain Clarke declared that "if he [the law officer] is quoting an interpretation of

the law, he has got to convince me that his interpretation is correct, or I will follow my own conscience." He expected the law officer not only to "quote" the law, "but also to make certain arguments in support thereof."

We have frequently pointed out that the law officer is the sole source of the law for a general court-martial and that a member may become disqualified for service if he is unwilling to concede controlling significance to that functionary's instructions. United States v Dean, 5 USCMA 44, 17 CMR 44; United States v Parker, 6 USCMA 274, 19 CMR 400. Here, Captain Clarke placed a very precise limitation upon his intention to abide by the law officer's advice. If the latter could "quote" the law or support his "interpretations and opinions" by an argument sufficiently convincing to persuade the member that his instructions were correct, then the law officer's instructions would be followed. Otherwise, Captain Clarke stated that it was his intention to follow his own, unexplained views. It should also be noted that the member adhered to this position despite every attempt by trial personnel to rehabilitate him. Accordingly, we are faced with a case involving service by a juror who has obdurately refused to acknowledge that he must consider the accused's guilt according to the law. Under such circumstances, I am sure that his participation in trial was prejudicial.

True it is that, following the unsuccessful challenge of Captain Clarke, the defense counsel did not exercise his right peremptorily to excuse the member. Normally, this would completely waive any error arising from his participation. In capital cases, however, we are usually more solicitous of the accused's right to a fair trial. Thus, in United States v Parker, 6 USCMA 75, 19 CMR 201, Judge Latimer pointed out, at page 88, that "waivers are seldom, if ever, relied on by appellate courts when a death sentence has been imposed." See also United States v McMahan, 6 USCMA 709, 21 CMR 31; Austin v United States, 208 F2d 420 (CA 5th Cir) (1953). There is an aura of finality about the adjudged

penalty which rightfully prevents us from basing affirmance upon such a slender reed.

As was stated by the Supreme Court in Fisher v United States, 328 US 463, 90 L ed 1382, 66 S Ct 1318, at page 467:

"Although no objection . . . is urged here by counsel for petitioner, this Court in a criminal case may notice material error within its power to correct even though that error is not specifically challenged and certainly should do so, . . . where life is at stake."

Accordingly, the doctrine of waiver should not be invoked here when it is clear beyond cavil that the challenge should have been sustained.

## II

During the course of the trial, the president of the court-martial, Captain McMillian, became alarmed at the lackadaisical attitude of accused's Marine guards. He concluded that corrective action was required. Accordingly, he summoned the Commanding Officer of the Naval Station at which accused was confined, the Brig Officer, and the Brig Guard Officer to a conference in his office. It was also attended by the law officer and the trial counsel. During the conference, the Guard Officer informed the president that new guards had already been assigned. Captain McMillian was also told that it was planned to have the accused attend "office hours" that day for other misconduct and that, as the Guard Officer had passed him in the hall, the accused had purposely applied a profane epithet to him. The Naval Station Commanding Officer also stated that "special precautions" might be required to handle the accused. At that point, the law officer intervened and the discussion ended.

In United States v Adamiak, 4 USCMA 412, 15 CMR 412, this Court initially considered the effect of extra-record consultations between members of the court-martial and other parties concerning the case. We adopted the Federal rule that such private communications are absolutely forbidden and invalidate the verdict unless the Government is able satisfactorily to show that the contact was harmless to the defendant. The Chief Judge separately pointed out that prejudice of this kind strikes at the very heart of a fair trial and warrants reversal regardless of the possible effect of the consultation. See also United States v Lowry, 4 USCMA 448, 16 CMR 22, and United States v Walters, 4 USCMA 617, 16 CMR 191. It is of interest to note that in the latter case, at page 633, the author of the principal opinion stated, concerning the effect of a recess conference involving the law officer and members of the court:

". . . Accordingly, we prefer to adhere to the view that any presumption of prejudice arising from such contracts may be overcome *when a clear showing is made that no subject of discussion could possibly bear on the court's determination of a case before it.* Cf. United States v Adamiak, supra." [Emphasis supplied.]

Turning to the instant record, no showing is made by the Government to rebut the presumption of prejudice arising from the extrajudicial conference. It demonstrates nothing more than the consultation was eventually spread upon the record at the insistence of the defense counsel. In my opinion, the report of the proceedings thus obtained, rather than overcoming the presumption of prejudice, clearly demonstrates harm to the accused. At the outset, it is immediately apparent that the subject discussed bore upon the case before the court-martial. United States v Walters, supra. Secondly, it is clear that the president was made aware of the Commanding Officer's proposed inquiry into other misconduct by the accused. Thirdly, it is patent that he was informed that this accused, on trial for the murder of one officer and the grievous wounding of another, had evinced hostility to a third in no uncertain terms. Finally, the Commanding Officer of the Naval Station mentioned the necessity for "special precautions." The discussion could hardly redound to the accused's benefit, particularly when it became necessary to determine the penalty to be adjudged.

United States v Shipman, 9 USCMA 665, 26 CMR 445. On the contrary, parties completely unconnected with the trial were permitted, in the absence of accused and his counsel, to depict circumstances which must have weighed heavily against him. The situation is as if the foreman of a civilian jury had consulted with the sheriff, in the presence of the prosecuting attorney and judge, concerning the dangerous propensities of the defendant. No court in the land would sanction such proceedings, and we should not place the stamp of our approval upon them. Accordingly, I conclude the Government has not sustained its burden of demonstrating that no prejudice resulted from the consultation between the president, the Commanding Officer, brig personnel, the law officer, and trial counsel, in the absence of accused and his counsel.

## III

During the testimony of Ensign Harrison, the witness was asked to display the scars resulting from the bullet wounds inflicted by Henderson. Following the demonstration, the following colloquy occurred between the witness, the law officer, and a member of the court:

"A. Yes. The bullet entered in this position, right here.

"LO: Indicating in the left side in the lower—Doctor, where would that be?

"COURT MEMBER (Doctor Staggers): The last rib within the abdomen."

It is well-settled that a member of the court-martial may not testify in the case and continue to serve as a member. Code, supra, Article 25, 10 USC § 825; United States v Mansell, 8 USCMA 153, 23 CMR 377; United States v McBride, 6 USCMA 430, 20 CMR 146; United States v Moore, 4 USCMA 675, 16 CMR 249. It is not necessary for the witness to deliver sworn testimony in order to become disqualified. United States v McBride, supra; United States v Mansell, supra. Indeed, we have applied the prohibition to the law officer when it appeared that he had, by his certificate, indicated the legal suffi-

574

ciency of a previous conviction. United States v Wilson, 7 USCMA 656, 23 CMR 120. Here, the member of the court-martial equally became a witness, for, by utilizing his medical expertise, he assisted the other members in determining the precise location of the entrance wound of one of the bullets fired at Harrison. The seriousness of the wound was unquestionably placed in issue by accused's plea of not guilty to the offense of assault whereby *grievous bodily harm* was intentionally inflicted. It is equally apparent the member thereby became a witness for the Government, for his medical knowledge was utilized to further a demonstration by one who specifically appeared for the prosecution. So to use a juror who is permitted to continue in the cause and deliberate on the basis of his own specialized knowledge is one of the evils which Congress sought to dispel by enactment of Code, supra, Article 25, 10 USC § 825. While it does not involve the contested issue of sanity, I am compelled to conclude that the member's expert aid in describing Harrison's wounds disqualified him from further participation in the trial. Here, the question is one of capacity to sit rather than bias or similar considerations. United States v Mansell, supra. Hence, the weight of the evidence is immaterial.

## IV

The next area in which I perceive error prejudicial to the substantial rights of the accused is found in permitting the prosecution to adduce evidence of the deceased's excellent general character when that matter had not been placed in issue. Compare United States v Desroe, 6 USCMA 681, 21 CMR 3.

Lieutenant (jg) John Richard Hart was called as a witness by the Government. On direct examination, he testified that he knew Ensign Morris well and that, of all the junior officers aboard the UVALDE, the deceased "was probably more sincere and more conscientious in what his duties consisted of probably than any of us." He put in many extras hours of work, participated extensively in athletics, and was

well liked by the crew. As an indication of the respect in which he was held, "the crew got together and made a spontaneous contribution for the family in his memory." Two defense witnesses were also cross-examined in such a manner that the deceased was presented as an outstanding officer.

The Manual for Courts-Martial, United States, 1951, points out, in paragraph 138f(3), that evidence of a victim's character *for violence or peaceableness* may be introduced in a homicide prosecution only where an issue of adequacy of provocation or self-defense is raised. United States v Desroe, supra. Otherwise, the deceased's character is irrelevant, for its adduction can serve only to inflame the members of the court-martial against the accused. The military rule is derived from Wigmore, Evidence, 3d ed, §§ 63 and 246. Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 213.

In Hillen v State, 108 Tex Cr 516, 1 SW2d 883 (1928), the admission of similar testimony was held erroneous. Of it, the court said, at page 885:

". . . The question arises: Why such proof, and why show the jury that appellant had killed the most highly thought of deputy sheriff the town ever had? That appellant's cause was harmed by such proof is plain.

". . . The proposition that the citizens of Tenaha valued more highly the services of deceased as a peace officer than any other man was not an issue in this case, and such proof could have been only harmful to the cause of appellant."

See also 2 Warren on Homicide, perm ed, § 204, page 337, and the cases collected in 40 CJS, Homicide, § 222.

The obvious intent of the prosecution in thus adducing proof of the deceased's excellent reputation and character was to arouse the court members against accused and to insure his conviction and imposition of the maximum penalty. While the accused's judicial admission of the facts surrounding the slaying normally might serve to overcome the harmful effects of the evidence of deceased's character, the question of mental responsibility was also in issue. Moreover, it was undoubtedly considered on the question of the punishment to be awarded. Under the circumstances, I am of the view that the error justifies a rehearing.

V

The next issue presented by this record is somewhat akin to the conference between the president and persons unconnected with the trial concerning accused's security. Accordingly, much of what I have stated with respect to that proceeding is also applicable here.

It appears that defense counsel noted an off-the-record conference between the president and the law officer. Subsequent examination of these worthies disclosed that the president presented two slips of paper to the law officer, containing questions proposed to be put to Dr. Diamond, a civilian psychiatrist testifying for the defense. He asked if the questions were proper. One contained a reference to the nature of an infection from which accused's girl friend was suffering. The law officer advised the president to ask the initial question in a manner which was not leading, "or did not show any advocacy." He also suggested that the word "gonorrhea" be stricken from the second question and that reference be made only to "an infection." He then presented to the president a copy of this Court's opinion in United States v Blankenship, 7 USCMA 328, 22 CMR 118. The president familiarized himself with the gist of that case.

It next appeared that the court had submitted numerous questions to the law officer in writing in order to obtain his ruling concerning their propriety. He indicated his view by either nodding or shaking his head—a procedure which the record nowhere reflects. The law officer conceded that "it's possible I may have shown one or two" questions to the defense counsel, but was unsure that he had done so. Most of the questions were "irrelevant and immaterial." One of the interrogatories was submitted by Lieutenant

Trueblood and involved whether Henderson's reduction in grade was more important than the loss of Ensign Morris' life. The law officer described the frequency with which the questions were submitted in the following manner:

"A. Well, I received so many notes in the past couple days that I really can't say. Perhaps the court members themselves would be in a better position."

This Court has frequently pointed out that a court member may not become a partisan advocate for either side. United States v Sears, 6 USCMA 661, 20 CMR 377; United States v Smith, 6 USCMA 521, 20 CMR 237; United States v Blankenship, supra. Heretofore, it has been my understanding that disqualification of a member on that basis did not depend upon the artfulness with which he framed his questions in order to conceal his advocacy but upon whether he had actually aligned himself with one side prior to entering upon the final deliberations. Certainly, it is true that the wording of members' questions frequently reveals their bias for the Government. United States v Smith, supra. It appears to me, however, that we did not intend to approve concealment of bias by suggesting in United States v Blankenship, supra, that court members submit their questions in writing to the law officer. On the contrary, I thought it clear that the suggested procedure was designed to permit the law officer, after learning the views of counsel for both sides, to make timely and appropriate rulings in order that the accused's representative would not be constantly faced with the undesirable task of objecting in open court to members' inquiries.

In the instant case, we possess no real knowledge concerning the questions which the court members desired to ask. The written inquiries were not made a part of the record, and we cannot scrutinize them to determine whether the members had, from the commencement of the trial, aligned themselves with the prosecution. See United States v Caldwell, 11 USCMA

257, 29 CMR 73. While we are given a hint concerning their nature by Lieutenant Trueblood's comparative inquiry into the relationship between accused's loss of rating and Ensign Morris' death, I am simply unable to conceive the route by which my brothers are able to conclude that the presumption of prejudice is overcome.

Moreover, in order to have an adversary proceeding, it seems clear to me that the law officer must consider members' questions and rule thereon in such a manner that counsel for both sides are afforded an opportunity to state their objections. We said as much in our consideration of the use of former testimony in United States v Johnson, 11 USCMA 384, 29 CMR 200, although we affirmed there as we could discern no basis on which counsel could have opposed the matter in question. In short, what we do here is make the law officer a member of the court again, despite the contrary command of Code, supra, Articles 51 and 39, 10 USC §§ 851 and 839.

It is in the light of these factors, aside from its extrajudicial nature, that I discern prejudice in the law officer's presentation of our opinion in United States v Blankenship, supra, to the president of the court. The untutored reader might well believe that the substance of our holding there was to point up the need for concealing advocacy rather than to withhold formation of a fixed opinion until all the evidence is in. Winebrenner v United States, 147 F2d 322 (CA 8th Cir) (1945). Accordingly, I cannot join my brothers in their conclusion that this matter was harmless.

VI

Following announcement of the findings, defense counsel brought to the attention of the law officer and the court information to the effect that one of the members had consulted outside sources in connection with the evidence presented in court. Nothing appears in the record to indicate that counsel was aware of the matter prior to the occasion on which he raised the question.

Interrogation of Lieutenant Mulderrig established that the member had consulted a psychiatric dictionary in order to ascertain the meaning of four terms used by Dr. Diamond in his testimony. The words involved were "psychosis, psychoneurosis, paranoid, [and] schizophrenia." Lieutenant Mulderrig also stated stated that if "any word was used in the courtroom, I went to Websters and looked it up." He was unable to recall the name of the psychiatric dictionary to which he referred, and could not state whether the definitions were "in any way inconsistent with the knowledge . . . later learned in the courtroom." However, his research assisted him in understanding the testimony of the various expert witnesses.

Subsequently, defense counsel sought also to question Lieutenant Mulderrig concerning whether he had referred to the Manual for Courts-Martial, supra, during the course of the trial. The law officer immediately ruled that there could be no inquiry into the use of the Manual, as it had not been left in closed session and "I know of nothing in the present state of the law that prohibits a court member from looking at a Manual at other times." Finally, after due deliberation, he permitted the defense counsel to question the court members concerning their possible use of any "outside sources." It appeared that no member, except as hereinbefore stated, had engaged in such research. Contrary to the assertion in the principal opinion, however, I believe it patent that the law officer, counsel, and court members, because of the former ruling, did not consider the Manual, supra, to be such a source.

Defense counsel's challenge for cause of Lieutenant Mulderrig was not sustained by the court-martial.

As the majority point out, we unanimously reversed a conviction of trafficking in narcotics in United States v Webb, 8 USCMA 70, 23 CMR 294, because of a court member's consultation of a volume entitled, "Narcotics, U.S.A." In that case, the author of the principal opinion stated, at page 76:

"In the case at bar, we need not consider whether the accused has the burden of showing prejudice or the Government the duty of showing its absence. To us, contrary to the finding of the board of review, prejudice is apparent. On the first day of the trial, the expert witness, who left something to be desired in his expertise in the field of narcotics, had identified a substance as marihuana. . . . Some doubt was cast on his qualifications and credibility as an expert . . . yet it is entirely probable that the use of the outside text rehabilitated him in the eyes of the court member. In net effect, what was uncertain became fixed in the mind of the offending member."

The Chief Judge, concurring, emphasized that "prejudice to an accused is presumed from the fact that a juror consulted 'outside sources' for evidence bearing on the accused's guilt." United States v Webb, supra, at page 77. I also concurred, pointing out that these issues go to the heart of a fair trial. See also United States v Guest, 3 USCMA 147, 11 CMR 147; United States v Lowry, supra.

Our holding in United States v Webb, supra, and the other cases cited establish that we also commence our examination of Lieutenant Mulderrig's misconduct with the presumption that it was prejudicial. The burden again rests upon the Government to dispel that cloud. Judge Latimer concludes they have succeeded, for he construes the record to mean that the member did no more than to refresh his recollection concerning the terms involved and that the reference to the dictionary did not result in gaining information different from that already furnished by the experts. As I have already pointed out, I read Lieutenant Mulderrig's testimony differently and am of the view that it establishes only that the terms, undefined by the experts, were, after his research, made meaningful to him. He stated that each definition extended to as much as fifty words. Although he concluded that his extra-record activity had not influenced him, I am certain that all are aware of the inability of jurors accurately to gauge the effect upon their

deliberations of such matters, particularly when they are made aware, as in this case, that they have erred. In brief, Lieutenant Mulderrig's conclusion and statements should be treated as no more than attempts to defend himself against counsel's appropriately aimed allegations of misbehavior.

Aside from differing interpretations of the record, however, it is still certain that the presumption of prejudice has not been dispelled.

The accused's confession and his judicial statements leave in issue only the questions of his mental responsibility and capacity to premeditate. There is evidence on both sides of the issue, and, upon the record, it must be concluded that the opinions of the experts concerning accused's mental condition differed only in degree. Those appearing for the prosecution stated that he possessed a paranoid personality but was not psychotic. The defense psychiatrist testified that accused had probably progressed from a paranoid state to a point at which he was suffering from the psychosis of paranoid schizophrenia. His reluctance so to testify was based upon his inability conclusively to demonstrate that Henderson, at the time of the offense, had broken with reality. Under the circumstances, whether the accused was believed by the court members to be suffering from a psychosis or a psychoneurosis, as well as the exact nature of his malady, became extremely important. Hence, it is obvious that the definitions of the terms which Lieutenant Mulderrig found are of tremendous importance. We are nevertheless left in the dark concerning their tenor or, indeed, their source. To say that, under such circumstances, the veil of ignorance is removed and the presumption of prejudice overcome is to conclude that harm is not present if a member of the court admits no more than the fact of his misconduct. As that approach completely eliminates the presumption attaching to such behavior, I must record my disagreement.

The second aspect of the *voir dire* of Lieutenant Mulderrig raises a slightly different problem. As I have noted,

the defense counsel was absolutely prohibited from conducting an interrogation of the member, or of the court, for that matter, concerning any use of the Manual for Courts-Martial during the proceedings.

In United States v Rinehart, 8 USCMA 402, 24 CMR 212, a majority of this Court, over Judge Latimer's dissent, held that no member of a general court-martial might have access to the Manual either during closed or open sessions of the court. We pointed out that such use would be *per se* reversible error from "a date no later than thirty days after the promulgation of the mandate in this case." United States v Rinehart, supra, at page 410. With reference to cases tried prior to that date, we stated that the doctrine of specific prejudice would be applied. United States v Rinehart, supra, at page 409; United States v Shaughnessy, 8 USCMA 416, 24 CMR 226. The accused's trial falls into the category which must be measured by the standard of specific harm. The author of the principal opinion agrees with the conclusion of the board of review that no prejudice to the accused is shown by the record. The rationale by which he reaches this conclusion is rather elusive, for the very matter concerning which accused complained is the prohibition by the law officer of any interrogation of a court member concerning his use of the Manual. Thus, defense counsel was unable to discover whether the volume was used in a prejudicial manner. As far as we know, each member may have referred at length to those sections of this text which discuss insanity, premeditation, murder, presumption, evidence, or what have you. The defense counsel sought to clarify the matter, and it hardly becomes us to state that he did not establish harmful use when he was not permitted to do so. I might also point out that he was not engaged in a mere fishing expedition, for his examination of Mulderrig demonstrated the accuracy of his information that this member had consulted other sources beyond the courtroom. Under the circumstances, I suggest that the limita-

tion upon his *voir dire* examination also requires reversive action.

In according detailed treatment to the foregoing errors, I have not overlooked the other matters discussed by the author of the principal opinion. For example, I note that the use of the presumption of sanity in the law officer's final instructions was not so clearly limited as it was in United States v Oakley, 11 USCMA 187, 29 CMR 3, and some question remains in my mind whether the abrupt change in the interpretation of the powers of the board of review, set forth in United States v Russo, 11 USCMA 352, 29 CMR 168, does not require us, in the exercise of our discretion, to return the case for further consideration of the appropriateness of sentence—particularly in light of the additional evidence relating to accused's mental condition at the time of the offense. These matters, however, fade into insignificance in view of the major deficiencies which I have pointed out. The latter affect the very fairness of the proceedings which led to accused's condemnation and, in my opinion, deny him due process. It may well be that Henderson is sane and deserves the extreme penalty for his actions. Our society has nevertheless prided itself upon having the same standards of fair play applied to both the guilty and the innocent. Congress, incensed by the *ex parte* court-martial proceedings of World War II, passed the Uniform Code in order to secure these same safeguards to members of our armed forces. When we, because of a subjective reaction to a brutal crime, draw unwarranted distinctions between the case at hand and our previous decisions, we subvert the Congressional purpose and abdicate our judicial function. That approach inevitably results in degradation of the law in the interests of personalized justice. I have many times indicated my opposition to such a standard of review, and no matter how horrible the circumstances of accused's crime, I cannot subscribe to it in this case.

I would reverse the decision of the board of review and direct a rehearing.