UNITED STATES, Appellee

v

JOHNNY B. TRIPLETT, JR., Specialist Four, U. S. Army
Appellant

21 USCMA 497, 45 CMR 271

No. 24,679

July 7, 1972

*Francis Heisler, Esquire*, and *Captain John D. Lanoue* argued the cause for Appellant, Accused. With them on the brief were *Colonel George J. McCartin, Jr.*, and *Captain Peter D. Pettler*.

*Captain James F. Motley* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway, Captain David E. Wilson*, and *Captain Benjamin P. Fishburne, III*.

## Opinion of the Court

QUINN, Judge:

The question presented on this appeal is the effect of post-conviction medical reports as to the accused's mental capacity to commit murder and to cooperate in his defense at the trial.

In a sudden and unprovoked attack, the accused battered Sergeant Merrill with a baseball bat. Merrill died the next day from head injuries inflicted in the assault. Charges of murder and wrongful use of marihuana were lodged against the accused, and, in due course, came on for trial before a general court-martial composed of a military judge without court members, as requested by the accused, at Long Binh, Republic of Vietnam.

One of the principal issues at trial was the accused's mental capacity to commit the homicide. Defense counsel requested special findings. In a Memorandum of Decision, the trial judge reviewed the evidence, which included testimony by a psychiatrist, and he found that, while the accused suffered "a temporary loss of reasoning" induced by marihuana and barbiturates, he was "beyond reasonable doubt . . . mentally responsible" at the time of the killing. He convicted the accused as charged, and sentenced him to a dishonorable discharge, confinement at hard labor for ten years, and accessory penalties.

While the record was pending appellate review, the accused was psychiatrically evaluated by a Sanity Board at Fitzsimons General Hospital, Denver, Colorado. In the opinion of the board, the accused was currently competent to "cooperate in his own behalf." The board did not concur in a diagnosis of "acute psychosis" that had been made in a military hospital in Long Binh subsequent to the trial and which had led to the accused's transfer to Fitzsimons. It did, however, conclude that the accused suffered from a "schizophrenic reaction" and could not distinguish right from wrong or adhere to the right at the time of the offense. It was further of the opinion that at the time of trial, the accued "did not possess the requisite mental capacity to reasonably or meaningfully participate in the Court Martial proceedings."

Relying upon the Fitzsimons report, the accused moved before the Court of Military Review for dismissal of the charges on the ground there was "more than a substantial doubt" that he was "mentally responsible" for his conduct. See Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 124. The Government countered with a request that before the court act further in the case, it submit the Fitzsimons' report to the Surgeon General "for review and comment." The court entered an order to that effect. The Office of the Surgeon General concurred in the opinions of the Sanity Board, adding that, "In retrospect it seems highly likely" that the accused suffered from a "thinking disorder prior to the offense" which, "in conjunction with a heavy drug dose . . . rendered him mentally incompetent at the time of the offense."

Military law accords a "preferred rating" to questions affecting the accused's sanity. United States v Burns, 2 USCMA 400, 9 CMR 30 (1953). The matter can be examined on appellate review regardless of whether it was determined at trial against the accused. Manual, supra, paragraph 124. The examination may involve three separate questions: (1) Is the accused mentally capable of understanding the appellate proceedings and cooperating with his counsel; (2) was the accused at the time of trial mentally capable of understanding those proceedings and cooperating with counsel in his defense; (3) was the accused mentally responsible in the commission of the offense? The appellate authority may choose the order in which to examine these questions that it deems, in its discretion, will best serve the interest of justice. United States v Thomas, 13 USCMA 163, 32 CMR 163 (1962). Here, the Court of Military Review elected to consider first the accused's ability to understand the appellate proceedings. It specifically determined that the Fitzsimons' report and the report of Office of the Surgeon General demonstrated that the accused had sufficient mental capacity to understand, and to cooperate with his

**499**

counsel in, the proceedings before the court. It, therefore, concluded that it could properly proceed with review of the case on the merits. See United States v Bell, 7 USCMA 744, 23 CMR 208 (1957). The accused does not challenge this finding. He does, however, contend that the court erred in rejecting his claim that the post-conviction evaluations of his mental condition establish his lack of competency to understand the court-martial proceedings and to cooperate in his defense at trial, and his lack of mental responsibility for the commission of the offenses charged. See Manual, supra, paragraphs 121–122; United States v Thomas, 13 USCMA 163, 32 CMR 163 (1962).

The court did not separately consider mental responsibility at the time of the offenses and mental competency at trial. Its decision implies, however, and the parties apparently agree, that the evidence in regard to the one is so intimately connected with the other that the court's decision as to mental responsibility at the time of the homicide is equally dispositive of the question of the accused's competency at trial. We turn, therefore, to consider the matters bearing upon the accused's sanity at the time of the offense.

In the memorandum in support of his special findings, the trial judge summarized the evidence dealing with the accused's sanity at the time of the offenses. In material part, he noted that, before the homicide, the accused had been regarded as a " 'real good' " soldier and had never exhibited "odd mannerisms or peculiar behavior." The accused worked as a cook, and in the period from October 1969 to April 11, 1970, the date of the offenses, he had performed well. In the late afternoon of April 11, the accused ingested two barbiturates. After a shower, he lay on his bed and smoked a half dozen marihuana cigarettes. According to his account of his activities, which he gave to the psychiatrist who examined him at his request, he then began to hear his mother's voice telling him to come home. He went

to the orderly room to talk to the commanding officer about the matter, but he soon returned to his room because he felt the commander was involved in a plot to keep him from returning home. He again went to bed. He began to feel "strangled and choked." Most witnesses, who had see the accused "immediately before, during, and immediately after" the killing, testified that his speech was coherent and he made "appropriate responses," but his behavior was "very strange." Evaluating the testimony of Major Jones, the psychiatrist who examined the accused, the trial judge said:

". . . The only psychiatrist or medical officer who testified at the trial was of the opinion that the accused was not mentally responsible. However, he found no evidence that the accused was suffering from any mental defect, disease, or derangement prior to the time the accused started smoking marihuana on the night of 11 April 1970, and he further refers to the period that the accused was psychotic as a 'psychotic episode' and that thereafter he was not psychotic or insane. There is no question but that the accused was acting in an irrational, bizarre, and hallucinatory manner at the time of the killing. Yet, his behavior and normal condition reexisted soon after the killing. His behavior for six months prior to the killing appeared to have been devoid of any indications of mental defect, disease, or derangements. On the evening of the incident he properly checked his work schedule before smoking the marihuana and acted in a very competent manner. It was only after he took the Immonoctal tablets and smoked the marihuana that he became psychotic or acted in a psychotic manner and hallucinated. This psychotic condition appears to have terminated soon after the effect of these drugs wore off.

"Thus, I find beyond reasonable doubt that the accused was mentally responsible at the time of the alleged killing, but that he was at the

500

time thereof suffering a temporary loss of reasoning caused and induced by the ingestion of marihuana and barbiturates, not amounting to legal insantiy [sic]. This case fits the general rule that voluntary drunkenness not amounting to legal insanity, is not a defense to unpremeditated murder, whether induced by or caused by alcohol or drugs. The accused appears to have also been suffering a personality or character disorder in the nature of a depressive reaction termed the 'short-time syndrome'. However, such character and behavior disorder did not raise a reasonable doubt that the accused [sic], but that the accused could and did entertain the specific intent to kill or inflict great bodily harm upon Sergeant Merrill. It is my conclusion of law that while the accused's voluntary drunkenness from drug use and his personality and character disorder might reduce premeditated murder to unpremeditated murder, that such would not reduce unpremeditated murder to any lesser degree of homicide."

The Fitzsimons Sanity Board report referred to the accused's account of his ingestion of barbiturates and smoking of marihuana. It also referred to the earlier diagnosis of the accused's condition as "psychotic reaction," and noted specifically that it did not concur in that diagnosis. The report comments on the accused's behavior at Fitzsimons. It notes "some improvement in terms of socialization" and more "affect and verbalization," but it observes that the accused continued to "deny any memory of the actual assault" on Sergeant Merrill; that he maintained that "house flies bother him by talking to him in attempts to communicate with him," and that he "continues to respond to auditory hallucinations." Despite the later circumstances, the board was of the opinion that the accused was mentally "competent to conduct or cooperate in his own behalf."

Two differences exist between the Sanity Board's report and the testimony of Dr. Jones at trial. First, Dr. Jones diagnosed the accused's condition as a "psychotic reaction"; the Sanity Board classified it as "schizophrenic reaction." Secondly, as the trial judge observed, Dr. Jones indicated that the reaction terminated as soon as the effects of the drugs and marihuana were dissipated so that the accused was mentally competent to stand trial; the Sanity Board, however, was of the opinion that accused's mental condition continued beyond the time of trial to an unspecified time before the date of its report, but as of the date of the report, the accused was considered mentally competent. The board did not specify the circumstances upon which it relied for its opinion that the schizophrenic reaction continued from the time of the offenses and through the trial. Oppositely, Dr. Jones testified there was no evidence to lead him to believe that the accused was psychotic before his use of barbiturates and marihuana so that, in his opinion, the psychotic episode was precipitated by the drugs and marihuana and terminated when their effects were dissipated.

Whatever its psychiatric classification, the reaction to which the accused was subject at the time of the homicide was indisputably induced by use of barbiturates and marihuana. The Surgeon General's report confirms Dr. Jones' opinion on this point. It points out that the only mental condition affecting the accused before the drug and marihuana use was a "thinking disorder." Presumptively, this thinking disorder continued to the date of the evaluation by the Surgeon General. Since the Surgeon General agreed with the Sanity Board that the accused at that time was "mentally competent to conduct or cooperate in his own behalf," it is apparent that by itself this disorder is insufficient to prevent the accused from distinguishing between right and wrong; it had that effect at the time of the killing of Sergeant Merrill only *"in conjunction with a heavy drug dose."* (Emphasis supplied.) Thus, the Surgeon General's report does not contradict the trial

judge's finding that accused's mental condition at the time of the offense was directly and immediately due to voluntary use of drugs and marihuana. Nor, is the Fitzsimons' report opposed to the finding.

Voluntary use of mind-affecting substances does not exculpate or mitigate a homicide that would in the absence of such use be murder. As we noted in United States v Hernandez, ·20 USCMA 219, 223, 43 CMR 59 (1970), "If a mental condition and voluntary intoxication do not independently exculpate, the sum of the two does not." It follows, therefore, the United States Army Court of Military Review did not err in concluding that the post-conviction reports did not so impugn the validity of the findings of guilty at trial as to require that they be set aside. To interpolate a negative in the pertinent Manual statement if from "the record as a whole . . . it appears . . . that [no] reasonable doubt exists as to the sanity of the accused," the findings of guilty should be approved. Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 124, page 24–6; United States v Wimberley, 16 USCMA 3, 8, 36 CMR 159 (1966).

One step back from the accused's contention that the post-conviction psychiatric evidence raised "more than a substantial doubt" as to his sanity at the time of the offense and, therefore, required dismissal of the charge against him, is whether the evidence obligated the Court of Military Review to order a rehearing of the sanity issue before a court-martial. This question has its origin in the concluding sentence of paragraph 124 of the Manual, which reads as follows:

"When further inquiry after trial produces new information which raises an issue concerning mental responsibility at the time of the offense, the affected charges and. specifications may be dismissed and appropriate action taken on the sentence or a new trial or rehearing may be directed, as may be appropriate under the circumstances of the case."

For present purposes, the crucial phrase is "raises an issue concerning mental responsibility at the time of the offense." Is that phrase used in the same sense as it is used in appellate assessment of the adequacy of instructions by the trial judge to the court members regarding issues of fact to be determined by them at trial? See United States v Kuefler, 14 USCMA 136, 33 CMR 348 (1963).

Paragraph 124 of the Manual authorizes consideration of post-conviction information "in the interest of justice." The actions it sanctions demand an analysis of the content, and a weighing of the value, of the new information. Manifestly, consideration of content and weight is required to determine whether, on "the record as a whole," a "reasonable doubt exists" as to the sanity of the accused at the time of the offense. Similar consideration of content and weight is required to determine whether the new matter is merely cumulative of that considered at trial, which obviously would not, in the interest of justice, require a rehearing. We commented on that kind of situation in United States v Schick, 6 USCMA 493, 494, 20 CMR 209 (1955), as follows:

"Once an accused has had a fair opportunity at the trial level to litigate the issue of his mental responsibility for an offense and his capacity to stand trial, those issues should, on appeal, be accorded the same treatment as all other contested matters. We mean that the question should not be tried de novo at every appellate level. A day in court means one fair and just trial of contested issues, and, when that has been granted to an accused, he does not have a right to a second trial in an appellate forum.

"The unusual circumstances here which prompt us to permit further

consideration of accused's sanity merit enumeration. This accused has been sentenced to death for the commission of an atrocious crime. He was tried in Japan where the only civilian medical experts available to him were Japanese. One of the psychiatrists was obliged to testify through an interpreter, and, thus, he may have labored under a rather severe handicap in his ability to convey his findings to the court-martial. Both medical witnesses had a minimum of time to conduct their examinations, and they indicate that during the trial they were handicapped in the development of the bases for their conclusions."

*Schick* was decided under the 1951 Manual. See also United States v Roland, 9 USCMA 401, 26 CMR 181 (1958). The 1951 Manual provisions regarding the "preferred rating" accorded insanity are substantially similar to those in the 1969 Manual. However, the phrase under review is new. Available background material as to its intendment indicates it was added to take account of case law to the effect that the obligation of the appellate tribunal to make further inquiry into the accused's sanity does not require it to litigate the issue as at trial. Analysis, Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 124. We conclude, therefore, that the Manual language as to "information which raises an issue" does not have the expansive scope of raising an issue at trial. Cf. Manual, supra, paragraph 122a.

As we construe the language and purpose of paragraph 124, it does not command a rehearing on the mere presentation of new information as to the accused's mental responsibility for the offense. All matter pertaining to the accused's sanity must be evaluated by the appellate tribunal. The nature of the evaluation depends upon whether the new matter is before the appellate tribunal as evidence supplementing the evidence of record or whether it is before the tribunal only for "the limited purpose of determining if the issue [of sanity] was raised"

so as to require further proceedings. United States v Roland, supra, page 404; United States v Thomas, supra. If on the record, as a whole, the tribunal concludes "that a reasonable doubt exists as to the sanity of the accused," it should set aside the findings of guilty and dismiss the charge. Manual, supra, paragraph 124, page 24–6. Conversely, if the tribunal determines that the total evidence casts no doubt on the accused's mental capability at the time of the offense, it can properly affirm the findings of guilty. Between these extremes is a gray area. In that area, reasonable minds might differ as to the meaning and weight of the new and old matter. Certainly disputed facts and opinions can better be tested in the crucible of examination at trial, but the mere existence of conflicting opinion does not necessarily require a rehearing. See United States v Wimberley, supra. Still to be determined is whether, considering all the matter on the issue, a different verdict might reasonably result if the issue was again presented to a court-martial. Obviously, an affirmative answer to that question would impel a rehearing. Compare United States v DuBay, 17 USCMA 147, 37 CMR 411 (1967); see United States v Roland, supra concurring opinion of Judge Latimer.

On the record before us, we are convinced that the Court of Military Review did not err in concluding that the post-conviction reports did not so impugn the validity of the findings of guilty at trial as to require that they be set aside. Accordingly, we affirm its decision.

Chief Judge DARDEN concurs.

DUNCAN, Judge (dissenting):

*Is the information new, and does it raise an issue concerning mental responsibility at the time of the offense?*

At trial in the Republic of Vietnam the issue of mental responsibility was litigated, and the appellant was found mentally responsible for his acts. The testimony of a single psychiatrist was

presented. He had examined the appellant twice in the stockade for brief periods of time and concluded that he was psychotic, but that such might have been induced by his use of marihuana and barbiturates over the period of an hour preceding the incident. He also testified that even *"without the history of having used marihuana, I would be very suspicious of the fact that he was psychotic at the time."* (Emphasis supplied.) Based on this testimony, the military judge made a specific finding of fact that at the time of the offense the appellant was "suffering a temporary loss of reasoning caused and induced by the ingestion of marihuana and barbiturates, not amounting to legal insantiy [sic]."

The Fitzsimons Sanity Board which found "[t]hat this EM at the time of the offense was NOT so far free from mental defect disease or derangement as to be able concerning the particular act to distinguish right from wrong nor was he able to adhere to the right" diagnosed the appellant as "[s]chizophrenic reaction, schizoaffective type, chronic, severe."[1] While the military judge found that the appellant's "behavior and normal condition reexisted soon after the killing," the Board found that "[a]t the time of trial and during the appellate process, he did not possess the requisite mental capacity to reasonably or meaningfully participate in the Court Martial proceedings."[2]

The Fitzsimons Sanity Board report contains a recitation of the fact that appellant smoked marihuana before committing the offense. This use having been considered, the Board, *unlike the medical expert who testified at trial,* nevertheless concluded that Triplett was not mentally responsible. I am impressed that the Fitzsimons report is based on a thorough examination with the advantage given by knowledge of the appellant's mental debility which has persisted from the time of his hospitalization until the date of the report. His continued hallucinations while at Fitzsimons can hardly be said to have been induced by foreign substances.

Nothing set forth in the two short paragraphs of the Surgeon General's report serves to age the newness that I find in the Sanity Board proceedings.[3] Therefore, it is clear to me that the information in the report is sufficient new information "which raises an issue concerning mental responsibility at the time of the offense," notwithstanding the fact that the issue of mental responsibility was litigated at trial.

The situation in this case is strikingly similar to that which we found in United States v Schick, 6 USCMA 493, 20 CMR 209 (1955). In *Schick,* the

---

[1] This report dated November 28, 1970, states in part:

". . . During the month of November, he did show some improvement in terms of socialization. He exhibited more affect and verbalization. However, he continues to be *delusional and hallucinates.*" [Emphasis supplied.]

The report classifies appellant as schizophrenic, rather than psychotic as concluded by the medical doctor at trial.

[2] Other pertinent portions of the Sanity Board report are:

"5. He is considered to be potentially dangerous to others.

"6. It is expected that this EM will require approximately 3 years hospitalization.

"RECOMMENDATIONS: 1. That his sentence be remitted to allow disposition through medical channels.

"2. That he be transferred to a VA hospital or Federal Confinement Facility."

[3] The Surgeon General's report states that it "concurs in the entirety of the findings and recommendations of the Sanity Board held on Specialist Triplett." The report, which is in reality only an opinion based on an opinion, also concludes that "it was this disorder, in conjunction with a heavy drug dose which rendered him mentally incompetent at the time of the offense." However, by his concurrence with the Sanity Board report, the Surgeon General recommends that the sentence be remitted to allow disposition through medical channels.

504

appellant had been examined by Japanese medical experts who testified at trial. During appellate review, a team of staff psychiatrists and psychologists of the Menninger Clinic examined Schick and opined that he was unable to adhere to the right at the time he committed the crime. The Menninger report also considered Schick to be permanently and incurably ill. The case was remanded to the board of review for reconsideration of the question of accused's sanity despite the fact that the issue had already been litigated at trial. However, we cautioned in *Schick* that in the normal instance "the question should not be tried *de novo* at every appellate level." (*Id.*, at page 494.) The interests of justice demanded it under the particular facts of that case.

In my opinion the reliance of the Court of Military Review on *Schick* in denying the defense motion is misplaced, especially in light of the specific provisions of paragraph 124, Manual for Courts-Martial, United States, 1969 (Revised edition). Even though the issue has been litigated at trial, it may again be raised by the presentation of additional new information,[4] *aliunde* the record, which may be considered by the Court of Military Review to determine whether new information warrants a new trial or a rehearing.

*Is there a duty to grant a rehearing?*

The Court of Military Review's opinion contains these conclusions about the information contained in the November 28, 1970, report of Sanity Board proceedings. First, the court stated:

"As the Government has not stipulated to the use of the Sanity Board Proceedings of 28 November 1970, this Court may not consider the above-mentioned proceedings for consideration on the merits of the case. United States v Thomas, 13 USCMA 163, 32 CMR 163 (1962)."

Later in the opinion, the court states:

". . . We have carefully considered the Sanity Board Proceedings of 28 November 1970 to determine whether it presents any matter which would warrant a rehearing on the issue of the appellant's sanity. We find no basis for ordering such a rehearing as, is indicated above, the appellant had the opportunity to and did have the matter fairly litigated at trial level. United States v Schick, 6 USCMA 493, 20 CMR 209 (1955)."

As I understand those conclusions, in the first instance the court held that it will not review the Sanity Board report for the purpose of deciding whether or not Triplett was mentally responsible at the time of the commission of the act for which he was convicted. Based on the advice of United States v Thomas, 13 USCMA 163, 32 CMR 163 (1962), that court appears to reason that it would be improper to make such a fact finding merely on "information" rather than "evidence" which resulted from formalized or stipulated testimony. With this thesis I agree.

Furthermore, I am persuaded that this Court's majority conclusion that "[t]he nature of the evaluation depends upon whether the new matter is before the appellate tribunal as evidence . . . or whether it is before the tribunal only for 'the limited purpose of determining if the issue (of sanity) was raised' so as to require further proceedings" is correct. My disassociation with the majority rises when we confront the "gray area" mentioned in the opinion. What standard must new information rise to in order to justify a new trial or a rehearing? The majority considers whether or not it (new information) is of such "content and weight" that "considering all the matter on the issue, a different verdict might reasonably result." Although I can agree with such a

---

[4] It should be noted that the Sanity Board report was not solicited by defense counsel but was the result of the appellant's extreme agitation and anxiety while in confinement. He was started on medication, hospitalized in Vietnam and Japan, and subsequently transferred to Fitzsimons General Hospital with a diagnosis of acute psychosis.

**505**

standard, I would express it somewhat differently. In my view the proper test is—has *new* information been submitted from which a reasonable mind could find for the accused on the issue. When new information is before the court, the question becomes whether justice demands that an opportunity be afforded to allow *new* information never before considered to become evidence to be weighed by the finders of fact along with other evidence of record.

Presumably in the case being reviewed, the majority decides that even if the *new information* had been presented to the finders of fact as *evidence,* a reasonable mind viewing the Sanity Board report, the Surgeon General's report, and the testimony of Major Jones, could not find reasonable doubt as to the appellant's sanity at the time of the offense. Stated another way, the conclusion dictates that no reasonable mind could believe the Sanity Board to the extent that reasonable doubt arises regarding the issue and disbelieve Major Jones' testimony and the Surgeon General's review. If the Sanity Board report information had been presented at trial as evidence, I perceive no basis for determining it so valueless or so dwarfed by other evidence that it could not be a basis for a finding of a lack of mental capacity to commit the offense.

Given an opportunity to be converted into evidence, it seems clear to me that a reasonable fact finder could find from the new information that Triplett lacked mental responsibility at the time of the offense. It may be that after consideration of the new evidence the issue again may be decided against the appellant. However, he is entitled to another opportunity for litigation of the issue, not an assurance of success.

Therefore, as stated above, I agree with the Court of Military Review that in the case before us the review is for the limited purpose of determining whether or not a new trial or rehearing may be directed. I disagree with their second conclusion as set forth above.

Paragraph 124, Manual, supra, provides that when the issue of mental responsibility at the time of the offense is raised "the affected charges and specifications *may* be dismissed . . . or a new trial or rehearing *may* be directed, as *may* be appropriate under the circumstances of the case." (Emphasis supplied.) In my opinion the use of the word *may* is intended to lodge discretion in the court in determining what action is appropriate. Therefore, in reviewing the decision of the court below in matters brought under paragraph 124, Manual, supra, I believe that it is not the function of this Court to substitute its judgment for theirs, but to disturb their decision only upon a finding of an abuse of discretion. Not all new information triggers court responsibility to order a new trial or a rehearing. In the evaluation of such information a court properly must consider that cross-examination and confrontation have not been afforded. The court should determine its potential, if any, as evidence. However, under the facts of the instant case, and being mindful of the extraordinary shield the court has placed before the issue of mental responsibility and based upon the new information and the record, a rehearing should have been ordered. In my opinion the failure to do so renders the action of the Court of Military Review legally inappropriate. I would direct a rehearing.