UNITED STATES, Appellee

v

ROBERT F. NORTON, Private First Class, U. S. Army, Appellant

22 USCMA 213, 46 CMR 213

No. 22,715

April 6, 1973

 

*Captain Leland M. Stenehjem, Jr.,* argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick, Colonel Joseph E. Donahue, Captain Gilbert J. Weller, Captain Peter T. Van Dyke,* and *Captain Mark L. Tuft.*

*Captain James F. Motley* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Captain Stan L. Spangler, Captain Richard L. Menson,* and *Captain Benjamin P. Fishburne, III.*

## Opinion of the Court

DUNCAN, Judge:

When the case we now review was before the Court of Military Review certain opinions of psychiatrists were before that court, which opinions were not in evidence at trial. That court decided that pursuant to the Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 124,[1] re- lief to the appellant in the form of dismissal of the charges or ordering a rehearing was unwarranted. We reverse.

*Nature of the Offense.*

On October 5, 1966, appellant Norton and Privates Wallace and Marchant rode together to Tacoma, Washington. Later that evening, without apparent

---

[1] Paragraph 124, Manual, supra, reads in part:

When further inquiry after trial produces new information which raises an issue concerning mental responsibility at the time of the offense, the affected charges and specifications may be dismissed and appropriate action taken on the sentence or a new trial or rehearing may be directed, as may be appropriate under the circumstances of the case.

**22 USCMA 214**

provocation, Norton struck Marchant starting a fight which was soon broken up by Wallace and others. At about 2:00 a.m. the next morning Wallace, after returning to Fort Lewis, went to bed. Thereafter, the appellant and a man named Sharkey approached Wallace in the barracks and demanded information as to the whereabouts of Marchant. Wallace said that he presumed Marchant was at home in South Tacoma. Next Sharkey began fighting Wallace; appellant began to kick Wallace. While Wallace and Sharkey continued to fight, Norton left the barracks and returned with a pistol. The appellant then placed the weapon to Wallace's head and twice pulled the trigger; however, the pistol failed to fire. Norton then shot Wallace in the back wounding him.

Witnesses testified that during both encounters, in Tacoma and at Fort Lewis, the appellant's eyes had a "glassy" look.

After shooting Wallace, the appellant was confined to the Fort Lewis stockade. From there he was absent without authority from December 13, 1966 until January 4, 1967, at which time he turned himself over to Fort Lewis authorities and was reconfined. Appellant again escaped from confinement at Fort Lewis on March 30, 1967. He was classified as in desertion from March 30, 1967 until December 15, 1967, when he was apprehended in New York City by an FBI agent and turned over to military authorities. Norton was confined to the stockade at Fort Dix, from December 15–18, 1967, until he escaped from the hospital prison ward. His second classification of desertion began with this escape and lasted until January 30, 1968, when he was apprehended in Los Angeles by civilian authorities and was later turned over to the proper military authorities on April 19, 1968.

Norton was tried and found guilty of one specification of assault with intent to commit murder (Article 134, Uniform Code of Military Justice, 10 USC § 934), one specification of absence without proper authority (Article 86, UCMJ, 10 USC § 886), two specifications of desertion (Article 85, UCMJ, 10 USC § 885), and two specifications of escape from confinement (Article 95 UCMJ, 10 USC § 895).

The sentence as approved provides for a dishonorable discharge, confinement at hard labor for 25 years, and accessory penalties.

*Litigation of the issue of mental responsibility at trial.*

The issues of appellant's mental responsibility (1) at the time of the commission of the offense[2] on October 6, 1966, and (2) to understand the nature of the proceedings and cooperate in his defense, were raised and litigated at trial. The expert medical testimony is summarized as follows:

I. *For the Government.*

Doctor Wilson stated that Norton was sane within legal terms and classified him as an antisocial personality. He had examined Norton four or five times.

Doctor Chipman examined appellant for about 20 minutes in February 1967, in the presence of guards and against Norton's protest. He classified him as an antisocial personality, but mentally responsible in the legal sense.

Doctor Chesky labeled the appellant as antisocial with partial impairment and barely under control, but responsible. He termed the appellant as ego-fragmented, which is a symptom of a schizophrenic reaction, but did not find the symptom inconsistent with his diagnosis of an extremely severe case of antisocial personality.

Doctor Fortiner examined Norton in October 1966, 10 days after the shooting and again in February 1967. He opined that the accused had never been well and suffered from a serious character and behavior disorder, but was accountable for his act.

Doctor Phrender examined the accused for about 45 minutes and of-

---

[2] The psychiatric testimony at trial related only to the alleged assault with intent to commit murder.

fered the classification as a severe character disorder, but responsible. He also indicated that it was difficult to distinguish between such disorder and a schizophrenic reaction.

The examinations made by Doctors Chipman, Phrender, and Wilson, were short interviews with Norton in the presence of prison guards.

## II. For the Defense.

Doctor Godfroy first examined Norton in March 1967, and again in August 1968. He classified him as schizophrenic, paranoid type. He concluded that appellant did not have the mental capacity to understand the nature of the proceedings and cooperate in his defense. He further stated that at the time of the offense the appellant was not able to distinguish right from wrong or to adhere to the right.

Doctor Crahan described appellant as a "simple schizophrenic" and while in his opinion he was legally sane at the time of the alleged offense, he probably had only a "limited capacity to perform the act charged against him."

*Before the board of review.*[3]

On March 20, 1969, appellate defense counsel moved the board of review for a stay in the appellate procedure pending receipt of post-trial psychiatric reports. The Government responded by urging that post-trial psychiatric evidence was relevant only to a determination of the appellant's capacity to participate in the prosecution of his appeal. By order dated April 1, 1969, the stay was granted and appellate defense counsel were directed to file psychiatric reports, which subsequently were filed.[4]

On April 14, 1969, the appellant moved the board of review that a medical board be convened to determine the nature of the accused's mental condition at the time of the offense, at trial, and at the then present time. The medical board's report, dated September 20, 1969,[5] concluded that the accused was unable to adhere to the right at the time of the offense, and he had insufficient capacity to understand the nature of the proceedings at trial and during the appellate process. The Surgeon General of the Army concurred in the findings of the medical board. The Government agreed to stipulate as factual only that part of the medical board's report which concluded that the appellant lacked the present mental capacity to participate in the prosecution of his appeal.

Despite a defense request for dismissal of the charges, the court's order only went so far as to further stay the proceedings because of the accused's lack of capacity to cooperate in the review proceedings. The order of the Court of Military Review, dated December 8, 1969, is in part as follows:

> With this [defense] contention we cannot agree. Having thoroughly reviewed all aspects of this case, including the record of trial, allied papers, and post trial psychiatric reports, and recognizing that the trial court saw and heard the witnesses, we are convinced that the issue of appellant's mental responsibility at the time of the offenses and his mental capacity to stand the 6 August trial was raised and

---

[3] On August 1, 1969, the United States Army Court of Military Review succeeded to the functions of the board of review. Article 66, UCMJ, 10 USC § 866, as amended by the Military Justice Act of 1968, Pub L No. 90–632, 82 Stat 1335.

[4] These reports were post-trial psychiatric reports originating at the United States Army Disciplinary Barracks, Fort Leavenworth, Kansas, where Norton was confined.

[5] The medical board's examination was made at Fitzsimons General Hospital. Appellant was transferred from Munson Army Hospital, Fort Leavenworth, Kansas, to Fitzsimons General Hospital on March 31, 1969. He was again transferred to the Medical Center for Federal Prisoners, Springfield, Missouri on July 31, 1970.

thoroughly and fairly litigated at that trial. . . .

. . . . .

Because appellate counsel for the defense would submit as evidence all the conclusions of the 20 September 1969 board of medical officers post trial psychiatric examination, and appellate counsel for the Government would submit only that portion of the report regarding the appellant's present incapacity to continue appellate proceedings, the appellant's present incapacity to continue appellate proceedings is the only portion of the post trial report submitted to this Court "by appropriate means" for our consideration as evidence (United States v Thomas, 13 USCMA 163, 32 CMR 263 (1962); CM 415254, Hostetler, 38 CMR 623 (1967); Cf. CM 418645, Campbell, decided 21 November 1969).

This Court denied review of the December 8, 1969 decision of the Court of Military Review to stay the proceedings.

After receiving a progress report from the staff of the Medical Center for Federal Prisoners, Springfield, Missouri, which indicated that the appellant then had the capacity to assist in his defense, the appellant moved to remove the stay and requested leave to file a supplemental assignment of error claiming that the evidence of his sanity at the "times of the offenses and at this time of trial" is insufficient in fact.

By order dated May 4, 1971, the Court of Military Review removed the stay whereby appellate review was to proceed, and, with respect to the supplemental assignment of error, granted the motion "except that in the appellate review . . . we will consider only evidentiary matters, regarding the issue of appellant's sanity, which are part of the record of trial."

On May 19, 1972, the Court of Military Review, after citing the text of its December 8, 1969 order,[6] then stated:

> Accordingly, the Court is of the opinion that the *evidence of record* establishes that the appellant was mentally responsible at the time of the offenses and was mentally capable at the time of trial; therefore, the supplemental assigned error is without merit. United States v. Henderson, 11 USCMA 556, 29 CMR 372 (1960). (Emphasis supplied.)

*Evidence and Information.*

In United States v Triplett, 21 USCMA 497, 503, 45 CMR 271, 277 (1972), the majority of this Court agreed:[7]

> As we construe the language and purpose of paragraph 124, it does not command a rehearing on the mere presentation of new information as to the accused's mental responsibility for the offense. *All matter pertaining to the accused's sanity must be evaluated by the appellate tribunal.* The nature of the evaluation depends upon whether the new matter is before the appellate tribunal as evidence supplementing the evidence of record or whether it is before the tribunal only for "the limited purpose of determining if the issue [of sanity] was raised" so as to require further proceedings. United States v. Roland . . . [9 U.S.C.MA. 401, 404, 26 C.M.R. 181, 184 (1958)]; United States v. Thomas . . . [13 U.S.C.M.A. 163, 32 C.M.R. 163 (1962)]. If on the record, as a whole, the tribunal concludes "that a reasonable doubt exists as to the sanity of the accused," it should set aside the findings of guilty and dismiss the charge. Manual, supra, paragraph 124, page 24–6. Conversely, if the tribunal determines that the total evidence casts no doubt on the accused's mental capability at the time of the

---

[6] Essentially the language from that order quoted hereinabove.

[7] In *Triplett* this writer disagreed with the test as set forth in the cited language. I would reverse a decision of a Court of Military Review made under paragraph 124, only upon a showing of an abuse of discretion.

offense, it can properly affirm the findings of guilty. Between these extreme is a gray area. In that area, reasonable minds might differ as to the meaning and weight of the new and old matter. Certainly disputed facts and opinions can better be tested in the crucible of examination at trial, but the mere existence of conflicting opinion does not necessarily require a rehearing. See United States v. Wimberley . . . [16 USCMA 3, 36 CMR 159 (1966)]. Still to be determined is whether, considering all the matter on the issue, a different verdict might reasonably result if the issue was again presented to a court-martial. Obviously, an affirmative answer to that question would impel a rehearing. (Emphasis supplied.)

The appellant argues that in the instant case the Court of Military Review did not observe the requirements of paragraph 124, as interpreted by this Court in United States v Triplett, supra. Appraisal of the extent of consideration afforded to the alleged new information presented first requires that we determine whether the post-trial medical evidence presented satisfies the element of "newness" as contemplated by paragraph 124.

The Government describes the post-trial information as new only in that it is information concerning "the appellant's conduct subsequent to trial was the primary basis for the holding of the psychiatric board at Fitzsimons General Hospital." It is argued that "[t]his 'new information' is not relevant to appellant's sanity at the time of his trial and at the time of the commission of the offenses."

■■■■ Our reading of the proceedings, both at trial and post-trial, shows that the examiners at Fitzsimons were well advised of the appellant's pretrial medical history, his conduct at the time of the offenses, his course of behavior in post-trial confinement, and their opinion was also in consideration of other then current medical examinations. While it is quite apparent that the medical board considered appellant's conduct while in post-trial confinement, we cannot, as the Government urges, hold as a matter of law that the evaluation of such conduct was the primary basis for the opinion expressed. Even assuming that Norton's post-trial conduct was the most weighty factor leading the board to its conclusion, we do not believe that would estop consideration of it as new information. Military law accords a "preferred rating" to questions affecting the accused's sanity. United States v Burns, 2 USCMA 400, 405, 9 CMR 30, 35 (1953). "The matter can be examined on appellate review regardless of whether it was determined at trial against the accused." United States v Triplett, supra at 499, 45 CMR at 273.

If medical experts find post-trial confinement conduct valuable in furnishing a basis for a reasonable medical opinion of mental capacity of a person at the time of the offenses or trial, we find no codal, Manual, or logical reasons for not considering such opinions as new information. After examination by the *Triplett* standard, whether or not the new information is merely cumulative, and insufficient to support an appellant's request for dismissal or rehearing, is a matter first to be determined by the Court of Military Review. If a rehearing is ordered, then the fact finders are obligated to consider all the evidence, including new information which can be made into evidence, bearing on the question of sanity and determine the issue.

*The medical board's report as considered by the Court of Military Review.*

At trial, medical expert testimony on the issue of mental capacity was introduced into evidence by both parties; therefore, the issue was litigated. Supplementing the record of trial, the Government's stipulation of that part of the medical report which concluded that appellant lacked the capacity to cooperate in the presentation of the appeal, was considered as evidence. To evaluate what consideration, if

any, the Court of Military Review made of the balance of the information contained in the medical board's report, we look to the court's opinions of May 19, 1972, May 4, 1971, and December 8, 1969. We mention the latter only for the reason that the order of May 19 recites: "[W]e are of the opinion that this Court . . . stands, relative to the appellant's mental responsibility at the times of the offenses and mental capacity at time of trial, in the same position as it did on 8 December 1969."

We note in the May 4, 1971 order, the Court of Military Review stated that their review of the supplemental assignment of error would be confined "to evidentiary matters" regarding the issue of appellant's sanity, which are part of the record of trial. The strictures of that order appear to rule out consideration of post-trial psychiatric reports.

However, directing our attention to the December 8, 1969 order, we note that the court states that they thoroughly reviewed "all aspects of this case, including the record of trial, allied papers, and post-trial psychiatric reports, . . . we are convinced that the issue of appellant's mental responsibility at the time of the offenses and his mental capacity to stand the 6 August trial was raised and thoroughly and fairly litigated at that trial."

The May 19, 1972 order then concludes:

Accordingly, the Court is of the opinion that the *evidence of record* establishes that the appellant was mentally responsible at the time of the offenses and was mentally capable at the time of trial; therefore, the supplemental assigned error is without merit. United States v Henderson, 11 USCMA 556, 29 CMR 372 (1960). (Emphasis supplied.)

■ We do not disagree with that court's conclusion that the issue of appellant's mental responsibility was "thoroughly and fairly litigated" at trial. Conceding the rather arcane nature of paragraph 124, we neverthe-less believe that the opinions of the Court of Military Review reveal that that court's appraisal of the post-trial psychiatric reports do not reach the necessary determination as established by the *Triplett* standard. From a reading of all orders and decisions it appears that the court, not considering the post-trial reports as evidence, did not go to the next step and decide whether the medical board's report and the Surgeon General's opinion called for a dismissal or a rehearing even though the trial evidence was thorough and sufficient on the issue of mental capacity. If we misconstrue the extent of the Court of Military Review's inquiry, in light of our conclusion in this case, it is unimportant. However, it is the better procedure for a tribunal when considering matters pursuant to paragraph 124, clearly to communicate its disposition of the matter of alleged new information.

*Dismissal or rehearing.*

We find no *evidence,* trial or supplemental, which calls for a dismissal of the charges. See United States v Thomas, 13 USCMA 163, 32 CMR 163 (1962).

Having decided hereinabove that the medical board of officers satisfied the requirement of "newness" under paragraph 124, we further perceive it to be "information." Recognizing that the opinon expressed by the medical board compliments [sic] certain trial defense testimony on the issue of mental responsibility, it cannot be classified as only cumulative. The medical board's report, concurred in by the Surgeon General, together with other post-trial psychiatric information is based on new and thorough medical examinations and observations. We are also mindful that the Government's medical experts, although supporting a finding of mental capability, establish appellant's long history of mental problems and the close relation of their findings to the symptomology of schizophrenia.

■ Normally, it will fall to the Court of Military Review to determine "whether, considering all the matter

on the issue, a different verdict might reasonably result if the issue was again presented to a court-martial." United States v Triplett, supra at 503, 45 CMR at 277. In this case, contrary to our usual inclination to remand it to the Court of Military Review to rule on *Triplett's* hypothetical question, we will assume that the court below would agree with us that a different verdict at trial is reasonably likely on the basis of the post-trial evidence herein, and, consequently, in the interest of justice, judicial economy, and the prompt disposition of the appellant's claims, we will direct a rehearing.

A rehearing is ordered on the questions (1) was the appellant at the time of trial mentally capable of understanding those proceedings and cooperating with counsel in his defense, and (2) was the appellant mentally responsible in the commission of the offenses.

The record of trial is returned to the Judge Advocate General of the Army for action consistent with this opinion.

Chief Judge DARDEN concurs.

QUINN, Judge (dissenting) :

As to the question of the accused's capacity to stand trial, nothing in the post-conviction material convinces me that were the material to be submitted to another court-martial, the court would likely reverse its original finding of capacity and conclude that the accused was mentally unable to understand the proceedings and to cooperate in his defense. The Clinical Record of the U. S. Disciplinary Barracks, dated March 28, 1969, indicates that the accused was admitted to the Barracks in August 1968, about two weeks after his conviction.

At his first psychiatric evaluation, it was determined that "sociopathic features predominated" in the accused's mental makeup. Thereafter, regular "psychiatric contact" was maintained. An Evaluation and Planning Report, dated November 27, 1968, indicates that no evidence could be found of "overt psychosis, organic brain impairment, or significant mood

disturbance;" it was "felt that . . . the subject [accused] suffered from a significant characterological disturbance;" he was diagnosed as "Antisocial personality." Another evaluation report, dated January 30, 1969, specified that the November evaluation "remains entirely applicable." It was further noted that the accused's performance "to date has been very good." The accused was reported to have "made an adequate adjustment for the first several months" of confinement and to have avoided disciplinary involvement. As confinement continued, however, the accused "decompensated, became acutely depressed and suicidal." Part of the decompensation was attributed to accused's alleged "homosexual concerns" which were "exaggerated recently" and which resulted in "loosened associations, bizarre behavior and paranoid ideation." Although the record does not attempt to account for its effect upon the accused, during this period, the accused's wife instituted divorce proceedings against him. In February and March 1969, the accused became "more acutely disturbed," and he was transferred to a medical facility.

Nothing in the Barracks Clinical Record and other psychiatric evaluation reports casts doubt on the court-martial's finding that the accused could understand the trial proceedings and cooperate in his defense. On the contrary, the finding is supported by the Clinical Record's description of the accused's conduct and testimony at trial as "largely manipulative and a voluntary attempt to appear pathological;" in other words, the accused dissembled at trial. True, a summary report accompanying the psychiatric evaluations suggests that the accused "was more acutely disturbed at the time of trial . . . than the sociopathic label would indicate," but even this report concludes that "intensive evaluation" was required before "any statement" could be made as to accused's mental responsibility "at the time of his court-martial."

A board of medical officers at Fitzsimons General Hospital further

evaluated the accused. It reported on September 20, 1969. One of its conclusions was that at the time of trial, the accused did not possess sufficient mental capacity to understand the proceedings and cooperate in his defense. No new factual justification for that conclusion appears in the supporting papers. In fact, the only reference to the accused's condition is that at trial his "behavior . . . appeared to be bizarre, confused and at times incoherent;" yet, the board did not disagree with, or reject, the earlier Barracks evaluation to the effect that the accused's trial conduct and testimony represented "a voluntary attempt to appear pathological." Also, the board did not disagree with, or attribute a different meaning to, the Barracks observation that the accused had made adequate adjustment for the "first several months" of his confinement and had "avoided significant disciplinary action;" nor did the board attempt to explain how a person who, according to its own evaluation, was mentally able to distinguish right from wrong at the time of the commission of the offenses in 1966 and 1967 and who was able to make the cited adjustment in confinement immediately after conviction from September 1968 through December 1968, could not, in August 1968, understand the trial proceedings and could not cooperate in his defense. In my judgment, the absence of any information as to these matters casts serious doubt on the board's conclusion. In any event, the board primarily relied upon the accused's conduct and testimony at trial to support its opinion; that conduct and testimony were before the court-martial when it considered the defense motion for a stay of proceedings on the ground of the accused's incapacity to understand the trial and to cooperate in his defense. The court decided the issue against the accused. The board's report, therefore, presents nothing new that is likely to produce a different finding if the court against considered the matter.

As to the accused's mental responsibility for the offenses, the post-conviction material demonstrates that the accused's psychotic states were episodic. The evaluations at the Disciplinary Barracks establish that the accused was not in a psychotic state when admitted to the Barracks in August 1968. They also establish that he did not decompensate until "several months after confinement." Even though the Barracks transferred the accused in March 1969 to Fitzsimons General Hospital "for more intensive psychiatric treatment and evaluation," it did not change its January diagnosis of "Antisocial personality." The Fitzsimons report indicates that the accused was, on admission and for the "first week on the ward," "delusional, had numerous homosexual thoughts and was extremely paranoid." But the Special Progress Report of the Medical Clinic for Federal Prisoners, Springfield, Missouri, to which the accused was later transferred, certified that by February 1971, the accused was fully able "to understand the charges against him and to cooperate with counsel and assist in his defense." Fitzsimons itself reported that the accused had no mental condition at the time of the offense that prevented him from distinguishing right from wrong as to the offenses charged. As to that aspect of the required proof of mental responsibility, therefore, there is absolutely nothing in the post-conviction material that is inconsistent with the court-martial's finding. Fitzsimons went on to say that the accused was not able to adhere to the right at the time of the commission of the offense. Again, no new facts about the accused were presented to support the conclusion. Fitzsimons' acceptance of the Barracks' report that for "several months" the accused presented no disciplinary problem while in confinement demonstrates, to me, that for significant periods of time the accused was, and is, fully able to adhere to the right. Reduced to its essentials, all that the Fitzsimons report offers on this point is opinion. Considering that the accused's mental state apparently alternates between periods when he is completely able to function within the limits of criminal responsibility and

periods when he suffers a psychotic episode, and considering that the Fitzsimons report is at least opposed, if not contradicted, by the accused's successful performance within the strictures of confinement, the unsupported Fitzsimons opinion does not impress me as being so weighty as to make it likely that if it were submitted to another court-martial, that court would overturn the earlier finding and determine that a reasonable doubt exists as to accused's mental ability to refrain from escaping from confinement, remaining absent without authority, and assaulting another with intent to commit murder.

Measuring the post-conviction material by what we said in United States v Triplett, 21 USCMA 497, 45 CMR 271 (1972), I would affirm the decision of the Court of Military Review.