UNITED STATES, Appellee,

v.

Specialist Four Joseph W. FARMER, SSN 195–40–2490, United States Army, Appellant.

CM 436237.

U. S. Army Court of Military Review.

25 Jan. 1979.

Captain Larry C. Schafer, JAGC, argued the cause for the appellant. With him on the brief were Colonel Robert B. Clarke, JAGC, Major Benjamin A. Sims, JAGC, and Captain Buren R. Shields, III, JAGC.

Captain Stephen D. Smith, JAGC, argued the cause for the appellee. With him on the brief were Colonel Thomas H. Davis, JAGC, Lieutenant Colonel R. R. Boller, JAGC, and Major Robert B. Williams, JAGC.

Before CARNE, FELDER and LEWIS, Appellate Military Judges.

## OPINION OF THE COURT

CARNE, Senior Judge:

This case is before the Court for mandatory review pursuant to Article 66, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866.

The appellant was charged with attempted murder and rape in violation of Articles 80 and 120, UCMJ, 10 U.S.C. §§ 880 and 920. Initially, he was also charged with a separate offense of murder in violation of Article 118, UCMJ, 10 U.S.C. § 918, however this charge was later severed.[1] Despite pleas of not guilty the court-martial with members found the appellant guilty of rape and assault and battery, however, the convening authority disapproved the findings of guilty of assault and battery. The sentence, as approved by the convening authority, provides for a bad-conduct discharge, confinement at hard labor for thirteen years, forfeiture of $247.00 pay per month for thirteen years, and reduction to the grade of Private (E–1).

Appellant urges several assignments of error, two of which we will address. *Inter alia,* appellant avers that he was denied his right to a speedy trial and that the court-martial members applied an incorrect standard in determining whether he was mentally responsible for his actions at the time of the offenses.

1. The appellant was subsequently tried and acquitted of the murder of Mrs. Olesak. *See* General Court-Martial Order Number 12, HQ V Corps, 8 June 1977.

## I

First we consider the issue of speedy trial. Appellant was placed in pretrial confinement on 11 October 1976. His trial on the merits commenced on 28 March 1977,[2] the 168th day after the inception of his confinement. While conceding that portions of the period may not be chargeable to the Government, he asserts that the Government is responsible for 117 days, which gives rise to the presumption of a violation of Article 10, UCMJ, 10 U.S.C. § 810. *United States v. Burton,* 21 U.S.C. M.A. 112, 44 C.M.R. 166 (1971).

The record reflects these events. The Article 32, 10 U.S.C. § 832, investigation began on 12 October 1976. A question arose on 21 October over whether the staff judge advocate had improperly influenced the Article 32 officer who was present when the staff judge advocate spoke to the defense counsel and implied that the defense counsel was possibly engaging in dilatory tactics. On the 22nd of October the staff judge advocate offered to replace the Article 32 officer. After five days the defense requested a new Article 32 officer and a new investigation was begun on 29 October.

The Article 32 investigation concerned three serious charges: the murder of Mrs. Patricia L. Olesak on or about 23 May 1975; the attempted murder of 2LT Susan Palmer on 11 October 1976; and the rape of 2LT Susan Palmer on 11 October 1976. The investigation involved (1) consideration of the testimony of approximately twenty-four witnesses; (2) translation of testimony from German to English and translation of Yugoslavian testimony to German and from German to English; (3) securing the presence of foreign national witnesses; (4) consideration of a substantial amount of scientific evidence; (5) sifting through a substantial amount of circumstantial evidence with regard to the murder charge; and (6) missing laboratory reports. The investigation was delayed by the unavailability of a German pathologist during the period 15 November through 2 December, which partially coincided with a delay requested by the defense counsel for the period from 22 November through 7 December, so he could attend the U. S. Army, Europe JAGC conference from 22–24 November and take ordinary leave from 25 November through 7 December. It also appears that the report was delayed because the Article 32 investigating officer's approach was exceedingly thorough and meticulous. He originally intended to submit a verbatim transcript of the hearing and commenced a verbatim report, but due to the sheer volume of testimony he finally submitted a summarized report of investigation on 20 December 1976. The staff judge advocate's advice was prepared and submitted on 21 December and the charges were referred to a general court-martial on the same day.

The first Article 39(a) hearing was conducted on 29 December, the 80th day of appellant's pretrial confinement. At that hearing, the Government announced that it was ready to proceed with available witnesses but that two to three weeks would be required to obtain some witnesses from Germany and the United States for both sides. However, the defense requested and was granted a delay for the purpose of securing a psychiatric evaluation of the appellant by a German physician. Since the defense could not report when the evaluation could be completed, the military judge stated that he was going to treat the defense request as an open-ended request for delay until he and the Government were informed that the defense was ready to proceed plus a two-week period to secure the presence of witnesses for trial. The defense agreed that two weeks for obtaining witnesses was reasonable and the hearing was recessed.

In a second Article 39(a) hearing called on 31 January 1977, the detailed defense counsel and the individual defense counsel requested permission to withdraw from the

2. Article 39(a) 10 U.S.C. § 839(a) sessions were held on 29 December 1976, 31 January 1977, 18 February 1977 and 22 February 1977.

case so they might give testimony relevant to a defense motion to dismiss on the basis of alleged command influence. The military judge ascertained that the appellant understood and approved of the withdrawal and that appellant was about to hire a civilian attorney, whereupon he granted the request and called for another Article 39(a) hearing on 18 February to ascertain the progress of the case.

During the third Article 39(a) hearing on 18 February, the defense presented four motions: (1) a motion to dismiss because of unlawful command influence; (2) a motion for a new Article 32 investigation on the grounds that the Article 32 investigation was inadequate; (3) a motion to dismiss for lack of speedy trial; and (4) a motion to sever the murder charge from the rape and attempted murder charges. The military judge denied the motion to dismiss for lack of speedy trial and the motion to dismiss on the grounds of unlawful command influence. In doing so he stated:

> What I see is a SJA attempting forcefully to manage his workload and cause his cases to progress and I see more than a little bit of jockeying and dickering for tactical advantage which is not, based upon what I have heard so far, related to any substantial matter in the case . .

The hearing recessed on Friday, 18 February 1977.

On Monday, 22 February, at the fourth Article 39(a) session, the military judge denied the motion for a new Article 32 investigation, but granted the motion for a severance, whereupon the Government and the appellant announced that they were ready to proceed on the charges of rape and attempted murder. The military judge set trial on those charges for 21 March, but the trial was later reset for 28 March, with the consent of the Government and appellant to enable the military judge to take other cases.[3]

Initially we consider what periods may be deducted[4] from the time for which the Government is accountable. First we consider the defense requested delay for psychiatric evaluation of the appellant which was granted on 29 December 1976. The record shows that prior to the granting of the severance on 22 February 1977, the defense had not informed the Government and apparently the court that the psychiatric evaluation was completed and that it was ready to proceed. Since the military judge and the parties had agreed that the delay would encompass the period from 29 December 1976 until the defense announced that the psychiatric evaluation was complete and that it was ready, plus two weeks to secure witnesses from the United States, we find that the delay for the benefit of the accused began on 29 December 1976 and terminated on 8 March 1977, a delay of 69 days, and that the Government was not accountable for this period.

We have considered the defense requested delay during the Article 32 investigation from 22 November 1976 through 7 December 1976, however since it is not clear whether the Government was otherwise prepared to proceed with the investigation during that period, we decline to deduct this period from the Government's period of accountability.[5]

Since there were no other defense requested delays, we subtract the 69–day delay for the psychiatric evaluation from the 168–day period and the result is 99 days for which the Government is responsible. Thus a presumption of a violation of Article 10, UCMJ, 10 U.S.C. § 810, arises under the *Burton* rule,[6] however, as the Court of Military Appeals noted in *United States v. Mar-*

3. The record does not reveal why the defense counsel consented to this further postponement nor does it indicate any evidence of a demand for trial.

4. *United States v. Driver*, 23 U.S.C.M.A. 243, 49 C.M.R. 376 (1974).

5. *United States v. Jones*, 6 M.J. 770 (A.C.M.R. 1978).

6. *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971).

*shall,*[7] the Government may still show diligence justifying a departure from the norm despite pretrial confinement of more than 90 days, by demonstrating that the case involved extraordinary circumstances, such as military operational demands, a combat environment, a convoluted offense, or a complex investigation.[8]

We conclude (1) that the extraordinary circumstances in this case justified a departure from the norm despite pretrial confinement of more than ninety days; (2) that due diligence was demonstrated on the part of the Government; (3) that appellant was not deprived of his right against unreasonable delays in the disposition of charges under Articles 10 and 33 of the Code, 10 U.S.C. § 833; and (4) that appellant was not denied a speedy trial.[9]

## II

■ Next we consider whether the court-martial applied an incorrect standard in determining whether appellant was mentally responsible for his actions at the time of the offenses.[10]

In *United States v. Frederick,* 3 M.J. 230 (C.M.A.1977), the Court of Military Appeals held that the American Law Institute standard on insanity[11] is superior to the *M'Naghten* standard and that it would be applied to all cases pending appeal on the date *Frederick* was decided (25 July 1977). The Court ruled that cases on appeal to which *Frederick* is applicable must be examined to determine if there is a fair risk of prejudice to each appellant from the use

of the rejected standard of mental responsibility. Under both the *Frederick* standard and the rejected standard, which is found in paragraph 120*b,* Manual for Courts-Martial, United States, 1969 (Revised edition), there is a threshold question regarding whether the accused had a mental defect or disease at the time of the offense. Without a finding of mental disease or defect there can be no finding of insanity and hence, no fair risk of prejudice to the appellant from the use of the rejected standard. *United States v. Frederick, supra* at 238.

Whether appellant had a mental disease on 11 October 1976 was a contested issue. The defense presented the testimony of a German physician, Dr. Georges Schaltenbrand, a neuro-psychiatrist, who had examined the appellant on three occasions for several hours each time. He testified that, in his opinion, there was a 70 to 80 percent probability that on 11 October 1976, the appellant had Huntington's Chorea, a hereditary disease of the brain that usually results in progressive degrees of mental deterioration and involuntary physical movement. He stated that his "suspicion" was based on his observations of a "twitching" of the appellant's face, a "family history" of the disease and a "parrallelism" in the appellant's history of behavior. The defense also called CPT Thomas R. Waddell, a clinical psychologist, who testified that he found no evidence of serious psychiatric disorder and that the appellant's intelligence level tended to be inconsistent with a diagnosis of Huntington's Chorea, although he could not rule it out. He also stated that his

---

7. 22 U.S.C.M.A. 431, 47 C.M.R. 409 (1973).

8. *United States v. Cole,* 3 M.J. 220 (C.M.A. 1977); *United States v. Hensley,* 50 C.M.R. 677 (A.C.M.R.1975).

9. *United States v. Cole, supra,* note 8; *United States v. Tibbs,* 15 U.S.C.M.A. 350, 35 C.M.R. 322 (1965); *United States v. Rainey,* 2 M.J. 1080 (A.C.M.R.1976), *pet. denied,* 3 M.J. 260 (C.M.A.1977); *United States v. Bracero-Valez,* 49 C.M.R. 22 (A.C.M.R.), *pet. denied,* 49 C.M.R. 889 (1974).

10. The military judge instructed the court that the applicable mental responsibility standard was the *M'Naghten* standard set forth in para-

graph 120*b* MCM, 1969 (Rev.), and the expert witnesses applied this same standard in their testimony.

11. (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

(2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

diagnosis could include (1) obsessive compulsive neurosis; (2) obsessive compulsive personality; and (3) explosive personality. In conclusion, he found a personality disorder, formerly called a character and behavior disorder. The Government called LTC Robert J. Sokol, a psychiatrist, who testified that he could find no evidence that the appellant had a mental disease, defect or derangement on 11 October 1976 and that he had observed no neurologic grimaces. The Government also called COL Eberhard Koebele, a neurologist, who testified that he examined the appellant and found no evidence of dementia or Huntington's Chorea; that the appellant's neurological examination was completely normal and that he did not appear to be emotionally disturbed.

The expert witnesses generally agreed that historically, Huntington's Chorea is a hereditary disease which appears in 50 percent of the offspring of a victim who has the disease; that it normally results in progressive degrees of dementia or involuntary physical movement or both depending upon what area of the brain degenerates first; that the disease is fatal; that there are two forms: a juvenile form that rapidly progresses and is usually manifested in motor disfunction and an adult form that usually begins between the ages of 30 and 40 and progresses slowly until the victim is completely insane and immobilized at death 10 to 20 years later; that Huntington's Chorea is indicated by a shrinkage of the brain on a brain scan and by an abnormal electroencephalogram [EEG].

It seems clear that the appellant did not have the juvenile form of the disease. There was no rapid degeneration of his health and he had already lived to age 26, at the time of the incident. While the possibility exists that appellant could contract the disease given the family history, the indications are contra. His EEG and his brain scan were normal. Since appellant was 26 at the time of the offenses, he was not a member of the age group that usually contracts the disease. His intelligence level was above average and others found nothing abnormal in his behavior leading up to the time of the offenses. While Dr. Schaltenbrand observed a facial twitching, the other three expert witnesses who examined appellant did not. Moreover, the appellant was re-examined at Fitzsimons Army Medical Center in April 1978 to evaluate his condition and it was determined that he did not need a repeat sanity board since his neurological examination was normal and there was no evidence of Huntington's Chorea.[12]

From the evidence presented, we conclude that despite the conflict of medical testimony, the appellant did not suffer from Huntington's Chorea or any other mental disorder,[13] since that view is more consistent with the overall evidence of record. The tape, gauze and shoe laces the appellant took to 2LT Palmer's quarters are evidence of a preconceived and calculated plan to overcome her and make her the subject of his will. The formulation and execution of the plan that included the continuing use of ruses concerning a professed problem to gain entry into the victim's apartment and an interest in religion to extend his unannounced visit for over three hours and to trap her in the bathroom, show that his mental processes were not impaired. Having come to this conclusion, we find that there was no fair risk of prejudice from application of the rejected standard of mental responsibility.[14]

We have considered the other assignments of error and find that they likewise lack merit.

Accordingly the findings of guilty and the sentence are affirmed.

Judges FELDER and LEWIS concur.

---

12. Government Appellate Exhibit 1, reported appellant's medical status as of 17 April 1978.

13. *United States v. Triplett,* 21 U.S.C.M.A. 497, 45 C.M.R. 271 (1972); *United States v. Michaud,* 2 M.J. 428 at 432 (A.C.M.R.1975).

14. *United States v. Hale,* 4 M.J. 693 (N.C.M.R. 1977) at 695, *pet. denied,* 4 M.J. 348 (C.M.A. 1978); *United States v. Brazil,* 4 M.J. 668 (A.C. M.R.1977) at 669, *pet. denied,* 5 M.J. 364 (C.M. A.1978).